# CITY AND COUNTY OF DENVER ET AL. *v.* DENVER UNION WATER COMPANY.

# DENVER UNION WATER COMPANY *v.* CITY AND COUNTY OF DENVER ET AL.

## APPEALS FROM THE DISTRICT COURT OF THE UNITED STATES FOR THE DISTRICT OF COLORADO.

Nos. 294, 295. Argued October 3, 4, 1917.—Decided March 4, 1918.

The findings of a special master appointed, with consent of parties, to take the testimony and report it with his findings of fact and conclusions of law for the advisement of the District Court, are not conclusive but subject to review by that court upon exceptions.

Where a master, so appointed, had heard the issues fully and admitted all proffered evidence, and the exceptions to his findings raised no serious questions of fact, this court found it unnecessary to remand the case to the District Court because the latter, erroneously, declined to pass upon the exceptions, but, having before it the evidence and all matters necessary for judgment, proceeded to do what that court should have done—considered the report, passed upon the exceptions, and made such decree as was deemed equitable.

Where a city was peculiarly dependent upon the continued use of the plant of a water company whose franchise had expired, the situation negativing the idea that other means were presently procurable or in contemplation for supplying the water vital to the community, and an ordinance was passed which, by its enacting provisions, not only fixed the rates which the company might charge in future but in addition provided for collecting charges semi-annually in advance for various uses which could not be discontinued on brief notice, required installation of meters for all prospective users, to be paid for monthly, and of hydrants to be ordered thereafter by the city upon extended as well as existing mains, at an annual rental, and imposed fines upon the company or its agents for any violation of the ordinance, *held*, that these provisions were inconsistent with declarations in the preamble characterizing the company as a tenant by sufferance and disclaiming any intention to recognize its right to

occupy the streets or continue the service; and that the ordinance should be construed liberally, so as to preserve the substantial rights of both parties, viz: as recognizing the city's dependence on the plant, as conferring, impliedly, whatever privileges might be necessary to enable the company to continue serving the public, as in effect requiring it to furnish water, and in terms forbidding it from exceeding the specified rates; and so, as granting a new franchise of indefinite duration, terminable either by the city or by the company at such time and under such circumstances as would be consistent with the duty owed by both to the inhabitants.

In view of the new rights so conferred upon the company, its plant employed in supplying the city with water must not be valued as "junk," but as property useful and in use in the public service, in determining whether the rates fixed by the ordinance allow an adequate return.

Nor is this question of value greatly affected, if at all, by the fact that there is neither right nor obligation to continue the use perpetually, or for any long period that may be defined in advance.

In valuing the plant of a public service company as a basis for determining the adequacy of rates fixed by a city, it is proper to estimate land at present market value, and structures at reproduction cost less depreciation.

Also the "going-concern value," due to the fact that the plant is assembled and established, doing business and earning money, is a property right which should be considered in such determinations, and estimated in each case upon the circumstances therein presented.

What rate of compensation may be regarded as adequate depends greatly upon circumstances and locality. In this case, where the net annual return obtainable under the ordinance rates was but 4.3% (approximately), of the value of the plant, excluding certain disputed water rights, in a city where the prevailing rate of interest for secured loans on business and residence properties was 6%, with higher rates for loans less secured, *held*, that the return was clearly insufficient and that the ordinance amounted to a taking of the company's property without due process of law.

Whether, in Colorado, a company under franchise contract to furnish water for a city becomes the owner of water rights which it originates by diverting water from natural streams and supplying it to the consumers under short license contracts—not decided.

Modified and affirmed.

THE case is stated in the opinion.

*Mr. James A. Marsh, Mr. Norton Montgomery* and *Mr. Edward C. Stimson* for City and County of Denver *et al.*

*Mr. Clayton C. Dorsey,* with whom *Mr. Gerald Hughes* and *Mr. William V. Hodges* were on the brief, for Denver Union Water Co.

MR. JUSTICE PITNEY delivered the opinion of the court.

We have here an appeal and a cross-appeal from a final decree made in a suit in equity brought by the Denver Union Water Company against the City and County of Denver and the members of its council and other public officials, for the purpose of restraining the enforcement of an ordinance passed March 3, 1914, fixing the rates for water permitted to be charged thereafter by the company, upon the ground that they did not afford a fair and reasonable compensation, based upon the value of the property of complainant necessarily used in the service, and hence amounted to a taking of private property without due process of law within the meaning of the Fourteenth Amendment. The City and County of Denver is a municipal corporation having broad powers of self-government, including the power on the part of five per cent. of the electors to initiate an ordinance by petition. For convenience it will be referred to as the City.

An answer having been filed, putting the cause at issue, the District Court, by consent of parties, appointed a special master, "with all of the powers conferred upon the master under the rules of practice for the courts of equity of the United States, and subject to the further orders of this court, . . . for the purpose of taking all testimony in the suit and reporting to the court said testimony, his findings of fact and such conclusions of law as he may deem essential to the proper advisement of

the court." After a full hearing he made an elaborate report, sustaining complainant's main contention. The City and the Public Utilities Commission, defendants, filed numerous exceptions to his findings and conclusions,. raising questions respecting certain elements that entered into his valuation of complainant's plant. Complainant, while declaring that it did not consent to a review of the report so far as it was conclusive under the order of reference, filed exceptions, subject to such ruling as the court might make respecting its reviewability. Upon these exceptions the cause came on to be heard, whereupon the court, being of the opinion that under the terms of the order appointing the special master his findings of fact were not open for its consideration, and that no material questions of law were raised that could be considered without an examination of the facts, ordered that the exceptions of both parties be struck out, confirmed the master's report, and passed a final decree in favor of complainant in accordance with his findings. Defendants appealed to this court, presenting assignments of error based upon the overruling by the District Court of their exceptions to the master's report. Complainant filed a cross-appeal presenting assignments of error for consideration only in the event that defendants' assignments of error, or some of them, should be sustained.

In our opinion, the District Court erred in declining to pass upon the questions raised by the exceptions. Although no opinion was filed, the ruling appears to have been based upon the theory that, because the order of reference was made by consent of parties, the conclusions of the master were not open to question. *Kimberly* v. *Arms,* 129 U. S. 512, 524, and *Davis* v. *Schwartz,* 155 U. S. 631, 633, 636, are cited in support, but they are distinguishable. In the former case, the reference, made by consent of the parties, authorized the master to hear the evidence and decide all the issues between them, and it

was because of this that the court held the findings were not merely advisory, as in the ordinary case, but were to be taken as presumptively correct, "subject, indeed, to be reviewed under the reservation contained in the consent and order of the court, when there has been manifest error in-the consideration given to the evidence, or in the application of the law, but not otherwise;" and that the findings ought to have been treated as "so far correct and binding as not to be disturbed, unless clearly in conflict with the weight of the evidence upon which they were made." *Davis* v. *Schwartz* is to the same effect. In the present case, the consent given to the order of reference was conditioned by the terms of the order itself, which, as we have seen, limited the functions of the master to the taking of testimony and reporting it to the court together with his findings of fact and conclusions of law for the advisement of the court.

The error of procedure, however, does not necessitate sending the case back to the District Court. The issues were fully heard before the master, all proffered evidence was admitted, the exceptions taken to his findings raise no serious questions of fact, we have before us in the record the evidence and all other materials necessary for judgment, and will simply proceed to do what the District Court ought to have done, namely, consider the report and pass upon the exceptions, and make such decree as is equitable in the premises.

It was admitted before the master, and is not here controverted, that the company is the sole owner of the water works, plant, and system in question, including lands, diversion works, reservoirs, filters, conduits, distribution works, and other apparatus, and is serving the City and its inhabitants with water, that no other water works or system of distribution exists in the City, and that although the City has power to construct a system of its own (subject to a limit of cost that will be mentioned be-

low), it has not commenced to do so.  It was, however, contended by defendants, in the answer and upon the hearing before the master—and the contention is here renewed—that as to such of the company's water diversion rights as had been acquired by it or its predecessors by original appropriation and user (as distinguished from those acquired by purchase) the right to the water itself was not the property of the company but of the City; and this upon the theory that, under the law of appropriation as it obtains in Colorado, the right of diversion belonged to those for whose use and benefit the appropriation was made, the company being entitled to compensation only for its services as carrier in distributing the water by means of the physical system owned by it.

The report of the special master shows, what is not disputed, that his investigation of the matters referred to him was most painstaking and thorough.  In estimating the value of the company's property, he adopted the following method, with the practical consent of the parties: lands and water rights were appraised at their present market values; estimates of the cost of reproducing the structures were made, and, from this cost, allowance for accrued depreciation was deducted so as to determine the reasonable value of the structures in their present condition; and in estimating the cost of reproduction it was assumed that the work would be done under contract after fair competitive bidding, and with reasonable costs for engineering and superintendence in addition to the contract cost.  Separate consideration was given to the various tracts of land owned by the company, and the various water rights, diversion works, reservoirs, conduits, distribution pipes, personal property, and other items constituting the plant.  He found the plant to be in excellent condition, supplying water abundantly in excess of the needs of the community and under a proper pressure, and found its entire value to be $13,415,899, in which the

only elements seriously questioned by the City were: (a) the disputed water diversion rights, which he held to be the property of the company and valued at $1,998,117; and (b) an item of $800,000 for "going-concern" value, allowed by the master upon the ground that the company had "an assembled and established plant doing business and earning money," according to the principle laid down by this court in *Des Moines Gas Co.* v. *City of Des Moines,* 238 U. S. 153, 165. He made no allowance for franchise value or for any permanent right to maintain the water works in the streets of the City; but he did value the plant as capable of use and actually in use in the public service, and found that a new plant capable of serving the public with like efficiency could not be built for $13,415,899; a finding to which no exception was taken. The master further found that the net earnings of the company under the ordinance of 1914, after making proper allowances for operating expenses, taxes, and depreciation, would be $488,820, or only 3.64% of the reasonable value of the plant; while the prevailing rate of interest for secured loans on business and residence properties in Denver was about 6%, with higher rates for loans less adequately secured.

Defendants now insist that the company is occupying the streets and performing its service merely at sufferance; that its rights arose solely out of a franchise ordinance adopted in 1890 and which expired in 1910; and that the City now has the right to exclude the company from its streets, and hence the right to fix the terms upon which it shall continue to do business, and that the value to the company of the property under these circumstances is what it would bring for some other use in case the City should build its own plant—in other words as to a large part of the property, "junk value." Of course, it is a necessary corollary that the company may discontinue its service at will.

We are unable to regard the case as capable of being thus disposed of upon the basis of "junk value" for complainant's property.

In the first place, no such question is presented, either by the pleadings, the master's report, the exceptions, or the assignments of error. The bill averred that complainant was "entitled to have its property devoted to the public use of supplying the City and County of Denver and its inhabitants with water remain unimpaired in value, and to receive for the water supplied and services rendered a reasonable return upon the value of the property so devoted to said uses, and a sufficient amount to protect said property against depreciation and other impairments of value." The answer admitted complainant's ownership of the system of water works (except that as to certain of the water rights it was denied upon legal grounds that have been indicated), and admitted that "complainant is entitled to have its property devoted to the public use of supplying the City and County of Denver and its inhabitants with water remain unimpaired in value, so far as its actual use in supplying the City and County of Denver and its inhabitants with water is concerned, and to receive for the services rendered in supplying such water a reasonable return upon the value of the property devoted to such use, and a sufficient amount to protect said property against depreciation and other impairments of value in connection with such use and such water service." The answer further alleged that the rates fixed by the ordinance of 1914 "are fair, reasonable, just, and will produce for complainant a fair, reasonable, and adequate return upon the capital actually invested by complainant in its water system and carrying service." The master's report shows that no question was made before him but that the plant should be valued as a plant in use, except as it was contended that the item of $800,000 for going-concern value ought to be eliminated on the

ground that such an element of value, admittedly exist-
ent in a "purchase case," could not be considered in a
"rate case," and on the further ground that the company's
franchise had expired.   This latter point was made the
basis of one of the exceptions.   Aside from this, the ex-
ceptions were devoted mainly to the contention, already
mentioned, that the company's water rights, other than
those which had been purchased, were the property not
of the company but of the City.   It was at no time con-
tended that any element of value except "going concern
value" ought to be excluded because of the expiration of
the franchise.   Defendants' assignments of error are
based upon the exceptions, and raise no other question.

But, supposing the question were properly raised, we
are convinced that by the true intent and meaning of the
ordinance of 1914 new rights were conferred upon the
company of such a nature that in considering the effect
of the provisions limiting rates the plant must be valued
not as "junk" but as property useful and in use in the
public service.

It is true the title and preamble of the ordinance con-
tain indications of a purpose to treat the company as a
mere tenant by sufferance of the streets, but its enacting
provisions do not carry out this purpose; and the measure
must be construed as a whole, in the light of the circum-
stances existing at the time of its adoption, and with
proper regard for the consequences that would result
from giving to it the meaning contended for by the City.

Under the ordinance of 1890 the company had a fran-
chise which expired April 10, 1910, at which time the City
had an option either to purchase the works at an appraised
valuation, or to renew the contract for a period of twenty
years.   After its expiration litigation ensued as a result
of which this court held, in May, 1913, that the City was
under no obligation to accept either option, and that its
failure to renew the contract did not amount to an elec-

tion to purchase the plant.  *Denver* v. *New York Trust Co.,* 229 U. S. 123, 138.  Meanwhile fruitless negotiations were conducted looking to a purchase of the plant by the City, but leaving the parties far apart upon the question of valuation.  The City on May 17, 1910, adopted a charter amendment whereby it created the Public Utilities Commission, directed that an offer of $7,000,000 be made for the property of the company, and provided that in case of its rejection steps should be taken to construct a water system owned and operated by the City at a cost not to exceed $8,000,000.  The water company rejected the offer of $7,000,000; but the City did not commence— has not yet commenced—the construction of its own water system.  The company continued to supply water to the City and its inhabitants at the rates charged during the continuance of the ordinance of 1890.  In August, 1913—after our decision in the case just mentioned—the City and the Public Utilities Commission appointed a commission of three to inspect, examine, and report upon complainant's water system, and after an investigation, during which complainant gave this commission every reasonable opportunity for inspection and examination of its records and data, the commission, on January 14, 1914, made a unanimous report to the effect that complainant's system was in excellent working condition, adequate for supplying the City's present needs, and worth, exclusive of going-concern value or water rights, something over $10,000,000, and declaring that it would take five years, without allowance for delays in legal proceedings, for the City to construct a new system of its own, and would cost $12,750,000.  After this report, and on February 17, there was submitted to the electors and taxpaying electors of the City a contract by which the City was to purchase complainant's water system and properties at a price to be fixed by appraisers including the Public Utilities Commission who were to act for the

City, which contract complainant agreed to accept and
abide by if favorably voted on by the taxpaying electors.
It was rejected. Prior to the first of February the ordi-
nance now in question, greatly reducing the rates, was
prepared at the instance of the Public Utilities Commis-
sion, circulated as an initiated bill under the appropriate
provision of the city charter, received the signatures of
more than five per cent. of the electors, but only 5,593 in
all,[1] was filed with the city clerk about a week after the
election just mentioned, was introduced in the City Coun-
cil, published once, and passed by the Council on March
3, without amendment and without hearings; that body
having acted either in the belief that, since the measure
was presented with the signatures of a sufficient number
of the citizens, it was mandatory upon the Council to
pass it, or else that they had no other option except to
refer it to a vote of the people, which was not done. (See
*Speer* v. *People*, 52 Colorado, 325, 343.) We remark upon
the legislative procedure simply because of its bearing
upon the interpretation of the measure, which, as we shall
see, lacks certainty in its enacting clauses.

The practical situation existing at the time of its enact-
ment is sufficiently clear from what has been said. The
answer admits the averment of the bill that complainant
has been and is compelled to continue to serve the City
and its inhabitants with water, because there is no other
supply of water available, and a cessation of its service
would result in great suffering, damage, and loss of life.
The City is located in a semi-arid region, and is and for
nearly a half century has been absolutely dependent upon
the continued operation of complainant's system. The
termination of the legal franchise in 1910 did not absolve
the City from its duty to the inhabitants. At the time
of the enactment of the ordinance of 1914 the company's
plant had been in use for four years since the expiration

---

[1] The population of the City, by the Census of 1910, was 213,381.

of the former franchise; the City, while endowed with
the power to construct a system of its own, but only if it
could be done at a cost not exceeding $8,000,000, had not
yet commenced the construction of such a system, had
just been officially advised that one could not be con-
structed for less than $12,750,000, and nevertheless had
rejected a proposition to purchase complainant's system
at an appraised value.

It is in the light of all these circumstances that the
provisions of the ordinance of 1914 must be read.   There
is a preamble reciting that since 1910 the company had
been without franchise and a mere tenant by sufferance
of the streets, and that, while it had been supplying the
City and its inhabitants with water, it had done so "at
rates that are excessive and that should be reduced and
regulated accordingly;" and there is a declaration that
the enactment is made without recognizing the company's
right to occupy the streets or to continue its service, but
for the purpose of regulating and reducing its charges
"during the time it shall further act as a water carrier
and tenant by sufferance of said streets."   But the enact-
ing provisions, in the terms employed and by necessary
intendment, are inconsistent with these declarations, and
must be taken to override them.   The first section estab-
lishes, as the maximum charges permitted to be made by
the company, a detailed schedule of "*semi-annual* water
rates payable *in advance* on the first day of May and No-
vember of *each year*."   The various uses are specified, and
many of these are of kinds that cannot be discontinued
on brief notice.   There is a special rate for irrigation by
the season, May 1 to November 1.   There is a provision
for meter rates, payable monthly, with a clause requiring
the company to instal a meter for any person desirous of
using water by meter.   Section 2 provides that for hy-
drants, including "those which may *thereafter* be ordered
by the Council to be set upon existing mains or upon *ex-*

*tensions* thereof," the City shall pay *annual* rentals. And § 4 imposes fines upon the company and its agents for any violation of the ordinance.

Of course, these provisions are of themselves inexplicit; but in attributing a meaning to them the choice is between a liberal construction that preserves the substantial rights of both parties and a strict construction highly penal and destructive in its effect upon both. The subject-matter was a prime necessity of life, for which there was no substitute available. The very act of regulating the company's rates was a recognition that its plant must continue, as before, to serve the public needs. The fact that no term was specified is, under the existing circumstances, as significant of an intent that the service should continue while the need existed as of an intent that it should not be perpetual. Without attributing to the initiators and to the City Council a purpose to subject the inhabitants to grave danger of disease or worse, we cannot read the enacting provisions as leaving the company actually without the right to maintain its plant in the City thereafter, for necessarily this would leave it at liberty to discontinue the service at will. The alternative, which we adopt, is to construe the ordinance as the grant of a new franchise of indefinite duration, terminable either by the City or by the company at such time and under such circumstances as may be consistent with the duty that both owe to the inhabitants of Denver. It recognizes the dependence of the City upon this plant, by necessary implication confers upon the company whatever privileges may be necessary to enable it to continue serving the public, in effect requires it to furnish water, and in terms prohibits it from exceeding the specified rates.

In this situation, there can be no question of the company's right to adequate compensation for the use of its property employed, and necessarily employed, in the pub-

lic service; nor can it be doubted that the property must be valued as property in use. It involves a practical contradiction of terms to say that property useful and actually used in a public service is not to be estimated as hav'ng the value of property in use, but is to be reckoned with on the basis of its "junk value." Nor is the question of value .for present purposes greatly affected, if at all, by the fact that there is neither right nor obligation to continue the use perpetually, or for any long period that may be defined in advance. The reason is not obscure: the cost and detriment to a property owner attributable to the use of his property by the public, and the value of the service rendered by the property to the public, are measured day by day, month by month, year by year, and are little influenced by the question how long the service is to continue. The cost of the service includes the use of the plant, but, ordinarily, not its destruction, except through the slow processes of wear and tear and obsolescence, for which graduated depreciation allowances are made. The whole calculation is a matter of income, not capital, accounting; and the cost and value of the use of a given property for a stated period is the same whether the use is to be continued after the expiration of the period or not. If the period is extended, compensation for the use is extended proportionately.

What we have said establishes the propriety of estimating complainant's property on the basis of present market values as to land, and reproduction cost, less depreciation, as to structures. That this method was fairly applied by the special master hardly is disputed by appellants, except as they contest the items allowed for "going-concern value" and for the water rights acquired by complainant and its predecessors by original appropriation. With respect to the former item, we adhere to what was said in *Des Moines Gas Co.* v. *Des Moines,* 238 U. S. 153,

165: "That there is an element of value in an assembled
and established plant, doing business and earning money,
over one not thus advanced, is self-evident. This element
of value is a property right, and should be considered in
determining the value of the property, upon which the
owner has a right to make a fair return when the
same is privately owned although dedicated to public
use."

As was then observed, each case must be controlled by
its own circumstances. In the present case, the master
expressly declared that his detailed valuation of the phys-
ical property and water rights included no increment
because the property constituted an assembled and es-
tablished plant, doing business and earning money; and
a careful examination of his very elaborate report con-
vinces us that this is true. The amount allowed by him
on this account is not open to serious question from the
standpoint of appellants.

The only remaining question of serious moment is the
allowance of $1,998,117 for the value of water rights ac-
quired by original appropriation as distinguished from
acquisitions by purchase.

The master found that these appropriations were made
at times when the company or its predecessor held fran-
chise contracts with the City calling for a supply of water
to the inhabitants; that these contracts were limited to
short periods, while the use by private consumers was
under simple permits or licenses for periods of six months,
at rates paid in advance, and under expressed conditions
that terminated their right to use the water on violation
of the reasonable rules of the company. The parties
agree that such a diversion and beneficial use of the un-
appropriated water of a natural stream is sufficient to
initiate and perfect a right to continue to use beneficially
the volume of water so appropriated. Complainant con-
tends, and the master held, that the ownership of the

appropriation under such circumstances may be fixed by contract between the one who diverts and the one who beneficially applies the water, and that under the circumstances of the case, upon a proper application of the rule adopted by the Supreme Court of Colorado in *City of Denver* v. *Brown*, 56 Colorado, 216, the water rights in question were owned by complainant.

Appellants contend that under the Constitution of Colorado, Art. 16, § 5, and under the law as established by repeated decisions of the Supreme Court, the right to the use of water is not permitted to be acquired by appropriation from the natural streams for purposes of sale or rental; that there is no ownership of the water or right to the use of it except by those actually applying it to a beneficial use; that not only must application to a beneficial use be united to diversion in order to render the right of appropriation complete, but that where a carrying company diverts water for the beneficial use of others it acts as the agent or quasi trustee of the consumers for the protection of their rights, and is not itself the owner of the rights of diversion.

In support of this view, *Wheeler* v. *Northern Colorado Irrigation Co.*, 10 Colorado, 582; *Farmers' High Line Canal & Reservoir Co.* v. *Southworth*, 13 Colorado, 111; *Combs* v. *Agricultural Ditch Co.*, 17 Colorado, 146; *Wyatt* v. *Irrigation Co.*, 18 Colorado, 298; *White* v. *Farmers' High Line Canal Co.*, 22 Colorado, 191; *Farmers' Independent Ditch Co.* v. *Agricultural Ditch Co.*, 22 Colorado, 513; *Wright* v. *Platte Valley Irrigation Co.*, 27 Colorado, 322, and some other cases are cited; it being insisted that they establish the rule contended for, and that their authority is not overthrown, but on the contrary recognized, by *City of Denver* v. *Brown*, 56 Colorado, 216. The question is one of great consequence, and is not free from difficulty. It ought not to be passed upon unless the exigencies of the case require it.

We find it unnecessary to determine it. As we have shown, the master found the value of complainant's entire plant, including these water rights, to be $13,415,899. Deducting $1,998,117, the entire value of the disputed rights, there remains a valuation of $11,417,782. No part of this is seriously disputed except the item for going-concern value, upon which we already have passed. The master found that the net earnings of the company under the ordinance of 1914 would be $488,820. No question is made about this, except some slight criticism of the depreciation charges that enter into the calculation; a criticism that we cannot sustain. The net return, therefore, is found to be only 4.2812 per cent. of the value of the plant, excluding the disputed water rights; while there is no controversy over the master's finding that the prevailing rate of interest for secured loans on business and residence properties in Denver is about 6%, with higher rates for loans less adequately secured. As was declared in *Willcox* v. *Consolidated Gas Co.*, 212 U. S. 19, 48, the question of the rate of compensation that may be regarded as sufficient depends greatly upon circumstances and locality. In that case we held (p. 50) that complainant was entitled to 6% on the fair value of its property devoted to the public use. We have no hesitation in holding that the return yielded by the ordinance now before us is clearly inadequate, and amounts to a taking of complainant's property without due process of law, contrary to the provision of the Fourteenth Amendment in that regard, even excluding from consideration the disputed water rights.

The decree of the District Court will be modified so as to overrule, instead of striking out, the exceptions taken by defendants to the master's report, and as so modified it will be affirmed.

*Modified and affirmed.*

MR. JUSTICE HOLMES, dissenting.

This is a bill to restrain the enforcement of an ordinance of the City and County of Denver, passed on March 3, 1914, fixing the rates for water permitted to be charged thereafter to the City and its inhabitants. After the coming in of the answer the case was referred to a special master, there was an investigation of the usual kind, a report and afterwards a final decree for the Water Company, vitiated by the judge's assumption that he was bound by the master's findings of fact. But I need not dwell upon this mistake, because in my opinion the decision ought to be reversed upon a more important ground. In some instances it would be proper to send back the case for further consideration, *Wilson Cypress Co.* v. *Del Pozo,* 236 U. S. 635, 657; *Brown* v. *Fletcher,* 237 U. S. 583; *Marconi Wireless Telegraph Co.* v. *Simon,* decided to-day; *ante,* 46, but that is unnecessary when there is disclosed a fundamental bar to the bill, and I may add that, if this be the fact, no omission to raise the point in technical form would induce this Court to enter a decree contrary to the manifest equities of the case. Rule 35.

The Water Company occupied the streets of Denver with its pipes under an ordinance of April 10, 1890, and it is not denied that the franchise granted by that ordinance had expired. *Denver* v. *New York Trust Co.,* 229 U. S. 123. I am of opinion that the ordinance complained of does not grant a new term. Perhaps an instrument could be framed that granted while it said that it did not. But this ordinance qualifies all that follows by a preamble that recites that the Water Company is "without a franchise and a mere tenant by sufferance of the streets of the City and County of Denver" and then, "without in any manner recognizing said The Denver Union Water Company's right to occupy the streets of the City and County of Denver, or to continue its service as a water carrier,

but for the purpose of regulating and reducing the charges made by it during the time it shall further act as a water carrier and tenant by sufferance of said streets," goes on to fix the rates. It seems to me plain that the rates subsequently established even though purporting to be monthly or semi-annual are established subject to the preliminary declaration, and to the chance of the practically improbable earlier termination of the license or tenancy at sufferance. The ordinance does not attempt to require the Company to furnish water but simply fixes a limit to its charges while it does furnish it as such tenant at sufferance. While the service continues it is charged with a public interest and is subject to regulation by law. The question at the bottom of the case is what elements, if any, the Company has a constitutional right to have taken into account in determining whether the rates ordained are confiscatory, and, more generally, whether it has any constitutional rights at all in the matter of rates.

We must assume that the Water Company may be required, within a reasonable time, to remove its pipes from the streets. *Detroit United Railway* v. *Detroit*, 229 U. S. 39, 46. And, to illustrate the problem, it may be asked how a company in that situation can assert a constitutional right to a return upon the value that those pipes would have if there under a permanent right of occupation, as against a city that is legally entitled to reduce them to their value as old iron by ordering them to be removed at once. In view of that right of the City, which, if exercised, would make the Company's whole plant valueless as such, the question recurs whether the fixing of any rate by the City could be said to confiscate property on the ground that the return was too low.

I understand that the Water Company has a right to stop furnishing water, corresponding to the right of the City to order out the pipes. It is hard to see how prop-

erty could be confiscated by the establishment of almost any rate when whatever value it would have over and above that dependent upon the use of the pipes would remain to the Company if it stopped using them and therefore was in the Company's hands to preserve. The ordinance of the City could mean no more than that the Company must accept the City's rates or stop—and as it could be stopped by the City out and out, the general principle is that it could be stopped unless a certain price should be paid. *Lloyd* v. *Dollison,* 194 U. S. 445, 449. *Ashley* v. *Ryan,* 153 U. S. 436, 443, 444. See *Denver* v. *New York Trust Co.,* 229 U. S. 123, 141, 142. It is true that this principle has not been applied in cases where the condition tended to bring about a state of things that there was a predominant public interest to prevent, but I see no ground for the application here of anything to be deduced from *Western Union Telegraph Co.* v. *Kansas,* 216 U. S. 1; *Pullman Co.* v. *Kansas,* 216 U. S. 56, or *Motion Picture Patents Co.* v. *Universal Film Manufacturing Co.,* 243 U. S. 502.

It may be said that to argue from such abstract rights is to discuss the case *in vacuo*—that practically the Company cannot stop furnishing water without being ruined, or the City stop receiving it without being destroyed. And no doubt this is true—but it also is true and not quite as tautologous as it seems, that the law knows nothing but legal rights. Something more than the strong probability that an enjoyment will continue must be shown in order to make an otherwise lawful uncompensated interference with it a wrong. See *Matter of City of Brooklyn,* 143 N. Y. 596, 616. *S. C.,* 166 U. S. 685. Or conversely if a legal title is taken it must be paid for in full notwithstanding a strong probability that the enjoyment of the property will continue long undisturbed. *Howe* v. *Weymouth,* 148 Massachusetts, 605, 606, 607. So here the mutual dependence of the parties upon each

other in fact does not affect the consequences of their independence of each other in law. The question before us is not what would be a fair compensation as between a necessary customer and a necessary seller, but simply whether the property of the Company is taken without due process of law by the City's fixing rates for a service, while it continues, that the Company may discontinue at will and the City may order tomorrow to stop. I am of opinion that it is not. See *Monongahela Navigation Co.* v. *United States*, 148 U. S. 312, 340, 341. *Appelton Water Works Co.* v. *Railroad Commission*, 154 Wisconsin, 121, 136, 137. Whatever may be the duty of the City toward its inhabitants, that cannot enlarge its obligations to the Company or of the Company to it after the franchise of the latter has expired, or change the meaning of an ordinance that to my mind is plain upon its face. I presume that if it be necessary the City or the Legislature can take the water works by eminent domain.

The question is different from that which would arise upon a franchise having but a short time to run but still in force. It might be argued that the short life was a fact to be considered, as no doubt it would be in some connections. See *Monongahela Navigation Co.* v. *United States*, 148 U. S. 312, 344; *West Springfield* v. *West Springfield Aqueduct Co.*, 167 Massachusetts, 128, 135; *Kennebec Water District* v. *Waterville*, 97 Maine, 185, 205. Or it well may be that while a limited franchise is in force the very fact that the Company has to rely upon the returns during the life of the franchise to reimburse its outlay and give it whatever profit it can make, entitles it to returns during that period unaffected by the approach of the end. There is no such question here.

MR. JUSTICE BRANDEIS and MR. JUSTICE CLARKE concur with this opinion.