HENRY L. DOHERTY & CO. v. TOLEDO RYS. & LIGHT CO. et al.

(District Court, N. D. Ohio, W. D.   August 2, 1918.)

No. 86.

1. COURTS ☞37(3)—JURISDICTION—PERSONS ENTITLED TO QUESTION.
 Where a city voluntarily intervened in a suit against a street railway, and a quasi receivership was undertaken upon the city's demand for relief, *held*, that the city was not in a position to question the jurisdiction of the court to restrain alleged illegal action by the city with respect to fares charged.

2. STREET RAILROADS ☞24(10)—FRANCHISE—USE OF STREETS WITHOUT.
 A street railroad, operating without a franchise, is not a trespasser, and it has the right to make reasonable use of the streets in the proper conduct of its business, until it is forbidden to continue by the city authorities, who may impose as an alternative to ejection reasonable conditions.

3. STREET RAILROADS ☞24(10)—FRANCHISE—USE OF STREETS.
 The power of a city to require a street railroad company, which was operating without a franchise, to remove from the streets, cannot be questioned in the courts.

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

4. STREET RAILROADS ⬅24(10)—USE OF STREETS—JUDICIAL INQUIRY.

Whether conditions as to the use of streets, imposed by a city upon a street railroad company operating without a franchise, are fair and reasonable, is a subject of judicial inquiry.

5. COURTS ⬅282(3)—FEDERAL COURTS—JURISDICTION.

The federal court has jurisdiction of a suit wherein it was asserted the conditions as to use of streets by franchiseless street railroad company were so unreasonable as to work a deprivation of property without due process, in violation of Const. U. S. Amend. 14.

6. STREET RAILROADS ⬅24(10)—OPERATING WITHOUT FRANCHISE—FARES—RIGHT TO CHARGE.

Where a street railroad company is operating without a franchise, and not bound by any contract stipulation, it has a right to demand for its service from time to time a rate of fare which will secure to it reimbursement for its expenditures properly incurred, plus a fair return on the property employed in performing the service.

7. CONSTITUTIONAL LAW ⬅298(2)—DUE PROCESS OF LAW—DEPRIVATION OF PROPERTY.

While it is for the public authorities in the first instance to regulate the rates to be charged by a quasi public service corporation, such as a street railroad, yet if the rates do not secure, in addition to a reimbursement of operating expenses, a reasonable or fair return on the actual value of the plant, enforcement will be a violation of the constitutional inhibition against the taking of property withoue due process of law.

8. CONSTITUTIONAL LAW ⬅298(2)—DUE PROCESS OF LAW—DEPRIVATION OF PROPERTY—"FAIR RETURN."

The fair return to which a street railroad company is entitled upon the value of its property is that rate per cent. actually received, in the absence of special contract, in the community where the service is rendered.

9. CONSTITUTIONAL LAW ⬅298(2)—DUE PROCESS OF LAW—DEPRIVATION OF PROPERTY—"FAIR RETURN."

Where the corporation performs a service obviously necessary and indispensable to the well-being of the community, the capital of the company upon which the fair return is to be computed should be the fair and reasonable value of the property used in such service, valued as the equipment of a going concern.

10. CARRIERS ⬅18(1)—RATES—JUDICIAL REVIEW.

The primary duty of regulating and fixing the rates to be charged by a quasi public service corporation, as a street railway, is upon the city authorities, and the jurisdiction of the courts is limited to a determination whether the rates are reasonable.

11. CARRIERS ⬅18(6)—RELIEF—ENJOINING OF FUTURE ACTION.

The proof of the inadequacy of a street car fare rate proposed by a city may be so clear and convincing that the courts are warranted in enjoining its imposition in advance of putting it in operation.

12. STREET RAILROADS ⬅24(10)—DUTY TO RENDER SERVICE—CORPORATION WITHOUT FRANCHISE.

A street railroad company, operating without a franchise from the city, has the right to cease at once its service and take up its tracks.

13. STREET RAILROADS ⬅24(10)—FRANCHISES—CONDITIONS.

Where a street railroad company was operating without a franchise, the act of the council in imposing conditions which the company refused to accept does not ipso facto require the company to leave the streets.

14. CARRIERS ⬅18(6)—FARE CHARGED—INJUNCTION.

Where the authorities of the city of Toledo proposed to take action to compel the Toledo Railways & Light Company, which was operating

⬅For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

without a franchise, to sell 11 tickets for 50 cents, *held*, that such action, under the circumstances, would work a confiscation of the company's property, and so would be enjoined in advance; the company being entitled to charge for its service a sum which would give a fair return.

In Equity. Bill by Henry L. Doherty & Co. against the Toledo Railways & Light Company and others, in which the City of Toledo became a party by its voluntary intervention. On petition by the Toledo Railways & Light Company for an injunction. Temporary injunction issued.

The Toledo Railways & Light Company, operating all the street railways of the city of Toledo, is a consolidation of several independent companies. The lines were governed by a number of separate franchises expiring at different dates. Some of the lines were permitted by their franchises to charge 25 cents for six tickets and others 50 cents for eleven tickets; 5 cents being the cash fare with free transfers. Franchises for some of the most important lines expired in 1910, and those of others, practically disintegrating the system, ran out March 27, 1914. Since this date street railway operations have been without a franchise, nor has the city attempted to prescribe conditions for the use of the streets, except as hereafter noted. For several years there had been intense agitation in the city over the franchise question, and a strong public sentiment had been created against the company. A temporary settlement of controversies was effected in 1911 or 1912 by the company conceding a fare of five tickets for 15 cents during two specified hours in the morning and two hours in the evening, with 5 cents in cash at all times, and six tickets for 25 cents for other hours, with free transfers. This arrangement, which was the fruit of an informal agreement, was operative until April, 1916. In 1913 the council passed an ordinance imposing a street rental of $250 per day on the lines on which the franchises had expired. A suit testing this matter was early brought in the state court, where it has remained without progress for five or six years. In 1913 a New York partnership, H. L. Doherty & Co., took over the management of the company. The municipal election of 1913 resulted in a defeat for the entire city administration, not, however, upon the street car issue, as all of the candidates for executive and legislative offices in the city were known to be unfriendly to a franchise for the street car company which provided a greater rate of fare than three cents. At the time of the election, Cornell Schreiber was city solicitor, and was defeated as a candidate for mayor on a platform hostile to the street car company. Immediately after the election, although the entire council and every city officer was to leave office within two months, and although the company had important franchises which were operative for nearly three months after new city officials came in, an ordinance passed the council at one sitting under suspension of the rules and was immediately signed by the mayor, providing that, in addition to the $250 per day street rental, the company should carry passengers for three cents after March 27th, with a condition that the operation of the cars after that date should be deemed an acceptance by the company of the terms of the ordinance. There was no alternative provision in this ordinance that, in default of compliance with its provisions, the company should cease running its cars, but the city solicitor was directed to go into an appropriate court to obtain an order enforcing it. This ordinance is generally known as the Schreiber ordinance, after its author. In January following, Doherty & Co., having obtained a judgment against the street railway company which was unsatisfied on execution because of prior liens, filed a creditors' bill in this court. This bill, among other allegations, raised the question of the confiscatory character of the Schreiber ordinance, alleging that an attempt to meet it would be to destroy the equity of redemption in the company. The new city administration indicated that it would enforce the ordinance, although no attempt had been made to get an order of enforcement as the ordinance provided. This situation led to an application in March, 1914, for a temporary injunction against the city of Toledo, upon the

hearing of which it was shown that the city had secured an exhaustive examination of the railway company's affairs by a well-known auditing company of its own selection, and that shortly prior to the passage of the so-called Schreiber ordinance the auditor had filed with the city an illuminating report plainly showing that a three-cent fare was impossible, and that, in addition, the head of the auditing company had written a personal letter to the mayor advising him in the most emphatic terms that a three-cent ordinance would be clearly confiscatory; all this information being in the hands of the city officers, including the then city solicitor, Schreiber, author of the ordinance, before the ordinance was drafted. The evidence on the hearing of the application for a temporary injunction showed that the city officers were proposing to enforce the ordinance by placing policemen on the cars to compel the acceptance of three-cent fares. Pending the court proceedings, the company at a great loss to itself instructed its conductors to permit every passenger to ride free who insisted on riding for three cents, and before the court had a fair opportunity to act 9,000,000 passengers availed themselves of this free transportation. A temporary injunction was thereupon issued in that case, which is, in fact, the same case now before the court; this present issue being between cross-complainants. The case still pending, in April, 1916, the company's platform operatives struck for higher wages, leaving the city without street car service for about two weeks. At this juncture the city of Toledo filed an amended cross-complaint to support an application concurrently made for the appointment of a receiver for the street railway company and to compel the company to resume and maintain its service. Issues thus arising were heard. The application for a receiver was not finally passed upon, nor was it withdrawn; but, as a modus vivendi, the company was ordered to suspend the three-cent hours and was permitted to charge its ordinary fare at such times, one half of the increased receipts to go towards defraying the expense of an increase in wages for its platform men and the other half to be delivered to a custodian appointed by the court to be disbursed in the purchase of additional equipment in the shape of new cars to improve the service; the city acquiescing in this as a temporary arrangement to terminate the strike, but not withdrawing its application for a receivership. At the municipal election of 1917, no further progress having been had in the pending case, and nothing having been accomplished by way of placing the street railway company under franchise, Mr. Schreiber, the city solicitor who prepared the so-called Schreiber ordinance in 1914, was elected mayor, not, however, on any issue involving the street railway matters. In the spring of 1918 the company was threatened with a walkout of its employés, having the effect of a strike, because of its inability to again increase wages on its current income. Prolonged negotiations were had between the company and representatives of the men and Mayor Schreiber. Again the city employed an accountant of its own selection to determine the relation of the company's income at its present rates of fare, 5 cents cash, six tickets for 25 cents, with free transfers, and a raise of wages, equivalent to 6 cents per hour, which all parties conceded the men should have. On the company's insistence that the facts and the accountant's report showed that it should be permitted to charge at least 5 cents straight for adult fares, with 1 cent additional for transfers, thus abolishing six tickets for a quarter and free transfers, the mayor issued what the company construed to be an ultimatum that, so far as he could influence the situation, a greater raise of fare than eleven tickets for 50 cents, with free transfers, would not be permitted, and that, if the company should suffer a strike or be unable to maintain its lines on that basis, he, the mayor, would see that the cars would run nevertheless. At this juncture the street railway company filed in the pending case an amended answer and cross-complaint, setting up the new facts and the mayor's position, and asking that the city be enjoined from interfering with its proposed raise of rates to 5 cents straight, with 1 cent for transfer. The application came on for hearing, the city's objection to the jurisdiction of the court was overruled, testimony was heard; the company producing, not only its own books, but the report of the city's special accountant, to sustain its claim that it must have the additional income indicated in order to raise wages, and thus avoid a walkout, to the disruption of its service. The court found that under

present conditions the company, to maintain its service, was under the necessity of increasing wages by at least 6 cents per hour, and that to meet such increased expense there was a present necessity of increasing fares as the company demanded, and that the mayor's ultimate rate was inadequate. It was also found that the company was justified in its construction of the mayor's attitude as a threat to use extraordinary measures to maintain street car service at his maximum rate of eleven tickets for 50 cents, with free transfers, and that he would interpose a veto to any legislation by the council more favorable to the company. By the charter of the city eleven votes are required from the sixteen councilmen to override a veto. A temporary injunction restraining the city from interfering with the rate of 5 cents straight and 1 cent for transfers was issued; the injunction, however, by its terms providing that it should not be construed to interfere in the slightest degree with the city's power to legislate respecting the conditions of street railway operation, including fare regulation.

Chas. A. Frueauff, of New York City, and Tracy, Chapman & Welles, of Toledo, Ohio, for plaintiff.

Rathbun Fuller, of Toledo, Ohio, for defendant Toledo Rys. & Light Co.

Ralph Emery and Cornell Schreiber, both of Toledo, Ohio, for defendant city of Toledo.

KILLITS, District Judge (after stating the facts as above). [1] The city of Toledo has been a party to this cause for more than two years. The issue raised when the case began has long since disappeared. The original complainant, for want of prosecution, long ago lost its right to the relief demanded in the complaint. The present controversy is between cross-complaining defendants, each of which has been in the case for some time; the city by its voluntary intervention. For more than two years certain interests of the defendant street railway company have been under the control of the court through a quasi receivership, which was undertaken upon the city's demand for relief. In addition, the city has pending in this court in this case a demand against the company to recover certain money damages. Therefore the city is in no position to question this court's jurisdiction to determine in this case the varying issues arising from time to time between it and the company. This record, however, leaves the court a sphere of action insufficient to relieve the company in the present situation without the formulation of a new issue, which has been attempted in the street railway's second amendment and second supplement to its amended cross-complaint. We have no doubt of the right of the street railway company to present this live question in this case, although to one accustomed to the reformed practice in the state courts it might seem that a new action had better have been instituted.

[2] Although the Toledo Railways & Light Company has been operating in Toledo for more than four years without a franchise, it nevertheless has the right to make reasonable use of the streets in the proper conduct of its business, until it is forbidden to continue by positive action of the city authorities, who may impose, as an alternative to ejection, reasonable conditions of use. City of Detroit v. Detroit United Railway, 172 Mich. 136, 137 N. W. 645. It is therefore no trespasser,

for the city authorities have not hitherto acted, either to eject it or to impose reasonable conditions of use.

[3] Because there is no contractual relation between it and the city of Toledo (that is, it has no franchise), the power of the city over it is limited to the pursuit of one of the two alternatives above suggested, namely, to order the company off the streets, or to prescribe terms of use which meet the law. The right of the city to eject the company from the streets cannot be questioned in any court. That would be the exercise of a public policy, the decision of which is delegated exclusively to the council.

[4, 5] Whether or not conditions of use imposed by the city authorities upon this franchiseless and privately operated public utility are fair and reasonable, provided they are not accepted by the company, is a subject of judicial inquiry (Reagan v. Farmers' Loan & Trust Company, 154 U. S. 362, 397, 14 Sup. Ct. 1047, 38 L. Ed. 1014), and within the jurisdiction of this court, because of the provisions of the Fourteenth Amendment of the Constitution of the United States (City of Cincinnati v. Cincinnati & Hamilton Traction Co., 245 U. S. 446, 38 Sup. Ct. 153, 62 L. Ed. 389. decided January 7, 1918; City and County of Denver v. Denver Union Water Co., 246 U. S. 178, 38 Sup. Ct. 278, 62 L. Ed. 649, decided March 4, 1918).

[6] When a public utility corporation is operating without a franchise, and, consequently, is not bound by any contract stipulation therefor, which is the case here, it has the right to demand for its service from time to time a rate of fare which will secure to it reimbursement for its expenditures properly incurred in rendering the service, plus a fair return upon the valuation of the plant actually employed in performing the service. Minnesota Rate Cases, 230 U. S. 352, 433, 434, 33 Sup. Ct. 729, 57 L. Ed. 1511, 48 L. R. A. (N. S.) 1151, Ann. Cas. 1916A, 18, and cases therein cited, and the recent decisions of the Supreme Court of the United States above referred to.

[7-9] It is for the public authorities, in the first instance, to regulate the rates to be charged for the service of such a corporation (Munn v. Illinois, 94 U. S. 113, 24 L. Ed. 77; Spring Valley Water Works v. Shottler, 110 U. S. 347, 4 Sup. Ct. 48, 28 L. Ed. 173; Reagan v. Farmers' Loan & T. Co., 154 U. S. 362, 397, 14 Sup. Ct. 1047, 38 L. Ed. 1014); but if such rates do not secure, in addition to a reimbursement of operating expenses, a reasonable or fair return on the actual value of the plant, to enforce them by the public authorities would be to violate the constitutional prohibition against taking property without due process of law (Brymer v. Butler Water Company, 179 Pa. 231, 36 Atl. 249, 36 L. R. A. 260). To the same effect are the decisions of the Supreme Court just referred to and many earlier decisions. The "fair return" to which the company is entitled upon the value of its plant is that rate per cent. actually received in the absence of special contract in the community where the service is rendered (Denver Case, above); and where the corporation performs a service obviously necessary and indispensable to the well-being of the community, the capital of the company upon which the "fair return" is to be computed should be the fair and reasonable value of the plant of the corporation engaged

in such service valued as the equipment of a going concern (Denver Case). In the Denver Case the Supreme Court found that 6 per cent. was the proper percentage, because of the same conditions respecting use of money prevailing in Denver which exist also in Toledo, wherefore we should take that rate per cent. as equally the one appropriate here.

It follows from the foregoing that there is no obscurity as to the rights of the company, or as to the limitations of the city's power of action, or as to the duty of the court when its authority is invoked by either party. The law is definitely and finally settled. The court can do nothing more than to refuse any relief to the street railroad company if the council tells it to get off the streets. It can do nothing less than to tell the city that it must allow to be collected a compensation for service which meets the conditions above established, so long as it permits the railroad to operate at all. There is no third course which the court can take, unless the parties agree.

[10] Primarily the duty of fixing regulations (including rates of fare) for street occupancy is upon the city authorities; it is only when the city in that behalf acts unreasonably, or fails to act at all, that the court has any function. The court cannot fix rates of fare to which the city is bound against its consent. Its power is nothing more than to say whether or not a particular condition of street occupancy, such as the fare to be charged, is reasonable, and if it finds such condition to be unreasonable, and a substantial interference with the constitutional rights of the company, the court may set such condition aside. If the city does not act, or until the city acts, the company, of its own motion and without the city's approval, may establish rates to which the public must conform, and to protect which it may appeal to a court. It has the same right to fix the price at which it will sell its service as the merchant has to put a price on his goods, and until the company's price is revised, legally, by the city or in judicial proceedings, it must be met by the car rider, if he would ride at all.

This is the bald situation in Toledo, a situation which is the logical and necessary result of a failure to agree upon a franchise contract. The city has narrowed its range of control by permitting the franchise to expire. What it might do in enforcing a franchise contract, it cannot do itself now, and has no right to ask the same of a court. Now, the city is hampered by economic conditions which it absolutely must regard in order to act lawfully. If the city council should now undertake its privilege and duty to fix rates and regulations for street car service, it must make such conditions conform to the economic burdens now borne by the company; otherwise, its action would be subject to overthrow by the courts on constitutional grounds. This is the compelling force of all judicial action on the subject. This power of the court has for a corollary the authority to say, when its jurisdiction is involved, whether a rate demanded by the company shall stand until the city acts. Lawful action thereon thereafter taken by the city would supersede the court's decree, which, obviously, would have but a temporary office. It is unreasonable to say that the city, by neglecting its obvious duty, could compel the company to leave so embarrassing a

question open, to be subject of contention at the pleasure of any car rider.

[11-14] It ought to be clear to every understanding mind that it is the present burden of expense upon the franchiseless corporation which persons receiving the benefit of its service should be compelled to bear at any one period. The inconvenient consequence of this principle is that a fluctuation of rates of fare is theoretically possible according as the expense of furnishing the service rises or falls with the fluctuation in the cost of labor and materials, for the operating company must bear the burdens as well as the advantages of its franchiseless condition, and has as clear a duty to reduce the fare when expenses fall as it has a right to increase when expenses rise. Public convenience and every demand of plain common sense, therefore, suggests that in times such as these, when prices and expenses are so extraordinarily liquid, when materials indispensable for operation, maintenance, and repair are extraordinarily high, and when high living expenses of the laboring man compel him to ask for higher wages, some principle of accommodation should be agreed upon, with reasonable conditions and concessions, propounded and accepted in a reasonable spirit on both sides, in negotiations between the city and the company.

On the motion for temporary injunction, two queries are before the court for answer: First, is the rate of fare which the company asserts it must now charge the rate which, in all probability, it has the right to ask, for the time being, in order to secure the return to which the authorities above cited say it is entitled? and, second, do the facts indicate a probable cause for asking this court to protect it in its demand? We are hearing a motion for a temporary injunction, decision of which involves the exercise of a discretion as the probabilities appear. We take up the questions in this apparently illogical order because, if the company shows a compelling probability that it should have what it demands, the fact that the city, charged by law with the duty of first passing upon those demands, deliberately ignored the plain force of the facts upon which the company relies, has some influence in determining whether or not the court should act. Official arbitrariness is not an infrequent cause of official oppression, and its presence is frequently an augury that rights which should be officially protected may be officially neglected, or even invaded.

The court is very strongly impressed by the testimony heard that the rate of fare which the company demands is necessary, at present, at least, if the company is to receive what the law says it should have. This is not the occasion when it should be determined what the fair valuation of the company's investment in its street car service is. We have no full data on which a judgment on that question can be definitely predicated. This much is entirely clear, however: That the valuation upon which what the Supreme Court calls a fair return should be calculated is probably very much more than $8,000-000. Taking it at this figure, however, which the testimony indicates to be an estimate much below the minimum even, the company is lawfully entitled to a rate of fare which will meet its current expenses and provide for it a return above mere operating expenses of at least

$480,000 annually.   It seems certain that the very best that can be said for the city, under any circumstances, is to say this; and it is the clear indication of the evidence before us that a fare of five cents, with a one-cent charge for transfer, will, under present circumstances, not pay the company's operating expenses enhanced by an increase of wages, and even this surplus.   Indeed, the city, if we may judge from the character of its argument to the court, is not seriously combating this proposition.   It does not argue anywhere in its brief that this rate is exorbitant.   All the city now contends for is to try some lower rate of fare by way of experiment, and see what the result will be, although all the evidence before this court indicates most clearly that the mayor's proposition of eleven tickets for fifty cents, with free transfers, will not meet what is due the company.

We are unable to see any right in the mayor to ask the company to submit to an experiment which present conditions show will be a losing one.   From his testimony, and the arguments submitted in behalf of the city, it does not appear that he had any confidence that this rate was adequate; for he says that, in fixing upon it, he was moved by the theory that the car rider, the car men and the car company each must sacrifice something in the present emergency.   But the mayor of Toledo has no right to demand of this franchiseless company that it render service to the city at a sacrifice, nor has he the right to say to the employés of the company that they must work for less wages than their services are fairly worth.   He ignores the fact that it is no sacrifice for the car riders of the city to pay any rate of fare which is what the service to them actually costs, and the economic truths that they should pay what the service to them costs, that the car men are entitled to a reasonable wage, and that the car company is entitled to a compensation which will allow it to live.   No one has the right, whether an official or not, to ask either the car men or the car company to make "sacrifices" that the car riders may get service at less than cost, and, of course, the court can listen to no such proposition as that to support an insistence that an inadequate rate should be imposed.

The Supreme Court of the United States in one of the cases cited by the city (Wilcox v. Consolidated Gas Company, 212 U. S. 19-41, 29 Sup. Ct. 192, 53 L. Ed. 382, 48 L. R. A. [N. S.] 1134, 15 Ann. Cas. 1034), as well as in another case in the same volume (Knoxville v. Water Company, 212 U. S. 1, 29 Sup. Ct. 148, 53 L. Ed. 371), recognizes that the proof of the inadequacy of a rate proposed by the city may be so clear and convincing that a federal court is warranted in enjoining its imposition in advance of putting it in operation.   That is the state of the evidence here on the question of the necessity of the company's rate.   The evidence comes from reliable sources, the most important being the city's own out-of-town expert.   For the purpose of the motion, then, for a temporary injunction, we find no difficulty in holding that it is probably necessary for the company to charge the rate demanded.

Is the second support of the motion made in the evidence?   Does the evidence suggest a probable cause for the intervention of this court to restrain oppressive action on part of the city or its officers?   To an-

swer this question the court is justified from the evidence in definite- ly concluding that the company was in a serious predicament when its application for a temporary restraining order was made. While it was not threatened with a technical strike, which, under the rules of the labor organization to which most of these trainmen belonged, seems to have been impossible, yet it was confronted with a situation the probable outcome of which seemed to be so serious a retirement of its operatives from its service that the combined effect would be that of a disastrous strike. The company quickly recognized that its men were justified as individuals in leaving its service because of the inadequacy of compensation which they received, and it is very clear to this court that it was not only the moral duty of the company to materially increase compensation to its trainmen, but it was as strongly the moral duty of the community to indorse the company's action in that behalf; it was plain that, unless the company did in fact increase its expense of operation very materially through an increase in wages, its service would be crippled, not only to its own loss, but to the very serious loss of the community itself.

But, to meet the morally just demands of its men, concededly the company must enhance its revenue. The mayor recognized that fact, for he proposed to indorse an increase of fares, and, upon the question of how to meet the serious emergency confronting the company, the only disagreement between it and the city authorities was as to the extent the increase should go. The company, not being controlled by franchise limitations, was not obliged to consult the city in fixing fare. As a matter of courtesy, or expediency, or both, it did invoke the city's co-operation, only to meet an ultimatum from the mayor which amounted to a threat. Of course, the mayor did not formulate his threat in definitely concise and unmistakable language; but that his attitude was one of hostility to the company, conveying a definite impression that he would go to any length possible to compel the company to meet his ultimatum, however embarrassing that would be, no moderately acute mind can fail to conclude from the testimony and evidence in this record. He plainly intimated that he would stand irrevocably upon the proposition of a maximum fare of eleven tickets for fifty cents, to the end of vetoing any legislation more favorable to the company than that. The mayor, through his veto power, is able to nullify five-sixteenths of the legislative authority of the city.

With the history of this controversy as it is in this record, to which we shall hereafter allude briefly, it would be a credulous person indeed who would assume it to be possible to get 11 councilmen to override the mayor's veto of an ordinance fixing fares at more than the mayor's figure, if, indeed, the council could be induced to pass any ordinance at all. In addition to the threat of a veto, if the counsel should act beyond the mayor's limit, the company was given to know that if it got into deep trouble with its employés, and gave thereby the mayor any excuse to appeal to some other authority to secure unembarrassed street car service, such excuse would be promptly accepted. Substantially, as the evidence shows, the mayor of the city, upon whom, with the council, rested just as great a responsibility for the settlement

of the difficulties in which this public utility was involved as upon the latter's managers, was in the attitude of saying to this company:

"Act against our arbitrary will at the peril of some proceeding instituted in the name of the city, which will result in taking from you the management of your company."

It is difficult to understand just what Mayor Schreiber meant when he said with vehemence to the representatives of the men and to the company, in effect, that, whatever might be the outcome of the controversy between the company and its employés, the street cars would run. It is inconceivable that he intended to use the power of the city to compel the dissatisfied employés to remain on the cars, and it is equally inconceivable that he intended any other action of a character friendly to the company. To assume that he would do anything more than he was most obviously compelled to do by way of helping the company would be to ignore the official record he has made in the past of hostility to it, of which the testimony concerning his present attitude as mayor gives no indication of repentance. Of course, it is not to be assumed that he had in mind anything that would be void of the color of legal justification. There is nothing, however, is this case to assure this court that he would have approached the executive problems confronting him in a spirit other than hostile toward the company, had the company's troubles resulted in its inability to maintain service. Of course, whatever he proposed to do was under color of his office, which fact meets the contention that the company's complaint is against individuals, and not against the city.

Some significance, as indicating the character of the mayor's appreciation of his responsibilities, may be attached to this paragraph in the city's answer, which is subscribed by Mr. Schreiber himself as one of the counsel for the city:

"This defendant [the city of Toledo] denies that the same [the operation of city street car system] is a vital necessity to the citizens and residents of said city, and denies that any interruption in the operation of the street car system of said company would work great and irreparable harm to said company, or to the citizens and residents of the city of Toledo as a whole, or to the interest of the United States."

We must assume that the mayor means here what he says, and therefore it is justifiable to think that this formal expression of his idea, deliberately placed in the city's defense to the present issue, indicates the degree of serious consideration he would give to a matter affecting the street car company and its public service. This averment in the answer suggests either a judgment on the part of the chief executive concerning the relationship to the city of its only organized means of intercommunication with which there must be an almost unanimous disagreement on the part of those who are alive to the city's welfare, or a hostility to the street car company so contemptuous and besetting as to render impossible to him a fair consideration of its problems. Whatever may be the reason for this remarkable statement, it serves to interpret the mayor's attitude toward the company's problems, and justifies an impression that a full measure of proper appreciation of them, and of the importance of a solution of them, with equal regard

to the company's rights and the city's service, is not now to be expected in the executive office.

We prefer to believe that, if once the question were put up to the mayor, he would do something to keep transportation going at all hazards, and that the remarkable statement above quoted justifies a feeling, only, that in so doing he might be substantially inconsiderate of the plain rights of the company. Whatever may have been in his mind when he said emphatically that under any circumstances the street cars would run, it seems that it must have been one or both of two ideas of extraordinary procedure, rather than that which the law, as well as common sense, plainly indicates to be the proper method, namely, a harmonious co-operation between the company and the city, through official action in which the uppermost thought would be the securing of justice both to the car riders and the company, and whereby the latter might maintain its system under reasonable and fair regulations, and the former would pay for the service what its rendition reasonably costs. He may have thought, in the event of the failure of the company to maintain full service, to invoke the assistance of a state court. In fact, many things in evidence suggest that that was in his mind. Probably, with the record here as the city itself has allowed it to be made and to remain, such a course would have resulted in a conflict of courts, in which the advantage would be with the federal court; but even a futile attempt of this sort is capable of involving the company in embarrassment, to prevent which a court of equity might interfere.

Although the company has the right to cease at once its service and take up its tracks (Cleveland Street Railway Company v. City of Cleveland, 204 U. S. 116, 27 Sup. Ct. 202, 51 L. Ed. 399), it is probable that the national emergency would impel presidential seizing of the street car system for operation, to protect war industries, and the mayor might have had this course in mind also, and to apply to the federal executive to that end. This action, which the company could not well oppose, would obviously be detrimental to its interests, provided that it wanted to maintain its system itself, and assuming that, if a fair treatment under the law were accorded to it by the city, it could carry on its service. An attempt in this way, by the city's action under these circumstances, to take the management of the system away from the company, might call for the intervention of a court of equity.

Neither of these courses could be invoked by the mayor without contravening the constitutional rights of the company, unless the company, because of its own deficiency of resource, was in default of its duty to the public. The city officials cannot be permitted to maneuver and jockey questions affecting the company with which they should deal fairly and impartially and fully, and then, because their official neglect, or worse, brings the company into unmerited embarrassment, seize upon that situation as an excuse to take away from it the control of its affairs. Courts are not so impotent as to be incapable of furnishing relief against such a situation. Whether or not the mayor's attitude was seriously threatening can only be cor-

rectly estimated by recourse to the history of the prolonged street car controversy, to Mr. Schreiber's previous relationship to that controversy here, and with reference to the sensitive condition of public sentiment on the part of a great portion of the citizenship using the street car service.

Four years have not yet passed since the company found itself compelled to carry millions of passengers free, because the present mayor of Toledo had been one city official to assure the car-riding public that three cents was a rate so entirely adequate as to be almost sacred, and that to demand more was to attempt extortion, and because the then city officials were indicating official protection to the dupes of the three-cent propaganda should the latter "stand on their rights" to ride for a rate which the city, later, confessed to be palpably confiscatory. The court cannot be obtuse to the impression that there remains yet enough of this unreasonable sentiment to add almost an intolerable burden to the company, if it should attempt to exercise its plain rights, unsupported, even if not definitely antagonized, by the mayor. With the author of the Schreiber three-cent ordinance and the measure demanding $250 per day street rental in the mayor's chair, fulminating an ultimatum that a rate must be adhered to as impracticable now as three-cent fare was in 1913, it is not to be wondered that the company feared that its rights were to be disregarded by the city, and that it was at the peril of some action under color of office which, at the least, would appeal to the imagination of that portion of the public which may yet feel, as it has been wrongly educated to feel, that antagonizing the street railway company is the highest form of official service, and which would, consequently, embarrass the company precisely as it was unfairly dealt with by the city four years ago.

This court is prepared to say that there is power in a court of equity to enjoin acts, lawful even, by the mayor of Toledo, the results of which would work inequity to the street railway company; that it can by its decree confine the parties to this case to that orderly procedure in the determination of their relations to each other which the law clearly points out. The city of Toledo is in this case, and has been for more than two years, with an application to the court for the security of an unembarrassed street car service in the city of Toledo, and with that application still pending, and the city here in that attitude, we do not propose to let its representatives in this emergency be free to take any extraordinary steps which will surely and necessarily embarrass the company in the performance of its plain duty to serve the public. However the mayor might act, whatever was in his mind when he said that the street cars would run in any event, no action he could take but would be within the condemnation of a court of equity, as a plain invasion of the equities of the company, unless it was either the securing by legislation from the council that which would permit the company to serve the public and at the same time to live as a business proposition or a direction to get off the streets.

We do not propose to permit an order to run out of this court which will restrain the city authorities of Toledo from the perform-

ance of any legitimate function in connection with this company. No order which we can issue can have any vitality which interferes with the city's prerogatives in that respect, but the city is limited to but one of the two courses of action hitherto indicated. Failing to get from the city any reasonable proposition of adjustment in this emergency, the company exercised its plain right to fix the figure at which it could for the time being meet the cost of its service, enhanced by the just demands of its men for increased compensation. All that the court can do is to preserve the status which the company has created, if upon investigation it appears that that is reasonable, leaving the city free to exercise all the wisdom, judgment, and moral courage which abides in its officiary in the settlement of terms which the company can accept.

It is not the law, although so stated in the brief of the city, that the council may prescribe conditions which, if unacceptable to the company, involve, ipso facto, a duty upon the company to abandon its service and leave the streets. The responsibility of determining whether the public of Toledo shall be served with a street car system or not cannot be so sidestepped by the city's officiary. In the hearing four years ago, this court decided, respecting the so-called Schreiber ordinance, that the company could reject unreasonable terms, and at the same time continue its service with the expectation of getting proper compensation, notwithstanding the hostile attitude of the city, until the city affirmatively directed the company to leave the streets as an alternative to the acceptance of unreasonable terms, and that holding finds itself amply justified by the recent decisions of the Supreme Court elsewhere referred to, particularly the case of Cincinnati v. Cincinnati & Hamilton Traction Company. So the temporary injunction which the court proposes to grant here will leave the city absolutely unhampered to legislate upon the subject which has been neglected for so many years. It will likewise, of course, leave the company free to apply to the court for relief against unreasonable legislation, unless the city authorities are brave enough to couple with unreasonable provisions of its legislation a specific alternative that the company must accept them or quit the streets.

It is not conceded, notwithstanding the brief of the city, "that the court cannot enjoin legislative action, and it is equally clear that the court cannot judge in advance that certain legislative action, if taken, would be void." While we are not attempting here to enjoin legislative action—just the contrary, we are trying to encourage it—yet it has been adjudicated that in extreme cases, and this is surely one, that may be done. Clearly foreshadowed legislative action of the city of Kalamazoo was enjoined by Judge Denison in Knickerbocker Trust Company v. City of Kalamazoo (C. C.) 182 Fed. 865, and much of the reasoning of that court applies here.

Much as the court regrets it, we expect this contention to remain with us until the sensible people of Toledo insist that the problem be approached from a different standpoint than that hitherto occupied generally by the city's official representatives. No injunction will issue from this court, temporary or otherwise, which will re-

strain the city from lawfully employing its full powers in any particular; but we may and will enjoin the city, and any one who assumes to act in the city's name, from taking any extraordinary action which has a tendency to embarrass the street railroad company in the performance of its service to the city, so long as the company is capable of and willing to serve the city with street car transportation.

A temporary injunction is to issue on the lines of the amended restraining order.