# DETROIT UNITED RAILWAY *v.* CITY OF DETROIT.

## APPEAL FROM THE DISTRICT COURT OF THE UNITED STATES FOR THE EASTERN DISTRICT OF MICHIGAN.

No. 666.   Argued December 9, 10, 1918.—Decided January 13, 1919.

Where the District Court, in denying a preliminary injunction, of its own motion dismisses the bill, its action is equivalent to sustaining a demurrer, and, upon appeal, the allegations of the bill must be taken as true.  P. 431.

A city, instead of exercising its power to compel the removal of tracks operated by a street car company without franchise, passed an ordinance looking to their continued operation by the company and prescribing fares and transfer privileges and penalties for violations. *Held,* equivalent to a grant of a right to operate during the life of the ordinance, entitling the company to a fair return on its investment. *Denver* v. *Denver Union Water Company,* 246 U. S. 178.   P. 435.

A company operated a system of city street car lines, for some of which it had franchises entitling it to charge a certain fare and for others no franchises.   An ordinance, regulating the entire system, purported explicitly to fix the fares for trips over two or more lines, whether franchise or not, and forbade extra charge for transfers, defining a continuous trip as a journey from one point to another in the city, whether made on one car or line, or by transferring from car to car or from line to line; declaring, however, that it should not be construed as an attempt to impair the obligation of any valid contract, but should apply to and govern all such street railway passenger traffic in the city except where governed by the provisions of such contract.

*Held:* (1) That the latter declaration must be construed as referring only to trips wholly on the franchise lines (p. 435); (2) that if its enforcement would result in a deficit to the company, as alleged, the ordinance violated the due process clause.   P. 436.

An ordinance compelling a street car company to carry passengers on continuous trips over franchise lines to and over non-franchise lines, and vice versa, for a fare no greater than its franchises entitle it to charge upon the former alone, impairs the obligation of the franchise contracts.   *Detroit United Railway* v. *Michigan,* 242 U. S. 238.   P. 437.

Reversed.

THE case is stated in the opinion.

*Mr. Elliott G. Stevenson*, with whom *Mr. John C. Don-nelly, Mr. William L. Carpenter, Mr. P. J. M. Hally* and *Mr. Bernard F. Weadock* were on the briefs, for appellant.

*Mr. Allan H. Frazer* and *Mr. Richard I. Lawson* for appellee.

MR. JUSTICE DAY delivered the opinion of the court.

The Detroit United Railway Company brought this action in the United States District Court for the Eastern District of Michigan to enjoin the City of Detroit from enforcing the provisions of an ordinance regulating street railway fares in that city. The ordinance was passed August 9, 1918. It is printed in the margin.[1]

---

[1] *An Ordinance* to fix and establish maximum rates of fares and charges which may be exacted and received by persons, corporations or partnerships operating street railways for the carriage of passengers within the City of Detroit, and to fix a penalty for the violation thereof.

*It is Hereby Ordained by the People of the City of Detroit:*

Section 1. No person, partnership or corporation operating a street railway on the streets of the City of Detroit, for the carriage of passengers for hire, shall charge more than five cents for a single ride, or six tickets for 25 cents, per person for one continuous trip within the city over any line which is now operated or shall hereafter be operated without a franchise fixing the rate of fare.

Section 2. No such person, partnership or corporation shall charge a higher rate of fare upon any line now or hereafter operated under a franchise contract than is fixed by such franchise.

Section 3. Between the hours of five and six-thirty a. m. and four forty-five and five forty-five p. m. tickets in strips of eight for twenty-five cents shall be sold on all cars on all lines except where such sale would be contrary to the terms of a franchise contract, which tickets shall entitle the holder to the same rights between said hours as the payment of a five cent fare would.

Section 4. Where a trip is over two or more lines, whether franchise lines or not, the maximum fare shall be five cents, and no transfer fee

The bill attacks the ordinance upon two constitutional grounds: 1st, That it impairs the obligation of the company's existing contracts; 2nd, That it is confiscatory and hence deprives the company of its property without due process of law. The suit came on for hearing before the district judge upon an application for a temporary injunction, the judge denied the application and upon his own motion dismissed the bill.

The question upon this appeal is: Did the bill, taking its allegations to be true, state grounds for relief to which the company was entitled upon the facts set forth? The action of the District Court was equivalent to sustaining a demurrer to the bill.

---

shall be exacted which raises the total charge to more than five cents or six for 25 cents.

Section. 5· A continuous trip means one journey from point to point within the city, whether the same is made upon one car or one line or by means of transferring from car to car or from line to line. Each such person, partnership or corporation, and the officers, agents, servants and employés thereof, shall, upon demand, furnish proper transfers to carry into effect the provisions of this section. The provisions of this Ordinance shall not be construed as an attempt to impair the obligation of any valid contract, but shall apply to and govern all such street railway passenger traffic in the city, except where the same is governed by the provisions of such contract.

Section 6. Any such person, partnership or corporation which shall violate the provisions of this Ordinance, or shall attempt to do so, and any officer, agent, servant or employé who shall order or direct any such violation or attempted violation of the provisions of this Ordinance, shall be guilty of an offense, and upon conviction shall be fined not to exceed five hundred dollars, or imprisoned in the Detroit House of Correction for not to exceed ninety days, or shall be both fined and imprisoned in the discretion of the court, for each violation.

Section 7. This Ordinance is passed for the public welfare in the case of an emergency involving the peace, health and safety of the people of the city, and it is ordered to take immediate effect. It may be amended or repealed at any time by the Common Council of the City of Detroit. Unless so amended or repealed it shall remain in force for one year from August 9, 1918.

The bill alleges that the complainant company is the owner of all the street railways in the City of Detroit, constituting a system of tracks of upwards of two hundred and seventy miles. The sources of title of the company are set forth in the bill, and shown by many exhibits. It is sufficient for the present purpose to say that the system consists of a considerable mileage of tracks upon which the franchises have expired; upon other portions of the system there are unexpired franchises, some of them derived from villages in which the roads were constructed, which villages were subsequently incorporated into the city. That from December 1, 1917, its system was operated, except the so-called 3-cent lines, upon terms as follows: 5-cent cash fares for each passenger carried on or over its lines, including so-called universal transfers, with workingmen's tickets, 8 for 25 cents, between certain hours, and on the so-called 3-cent lines a cash fare of 5 cents, with 8 tickets for 25 cents between certain hours; good only on such 3-cent lines with the privilege of a transfer on payment of a 5-cent cash fare, and also with the privilege of purchase of 6 tickets for 25 cents, also good between certain hours. It is averred that afterwards it became necessary to increase rates of fare. The bill recites the demand of the employees of the company for increased wages, which was refused; that a submission of the controversy was made to the War Labor Board; that the Board after a hearing awarded a substantial increase of wages, and recommended an increase in passenger fares to enable the company to meet this cost. The bill alleges that the increase made by the War Labor Board amounted to about $2,000,000 per annum. The company petitioned the city for an increase of rates of fare, and this petition was denied.

On August 7, 1918, the company put in force a schedule of its own, making single fares 6 cents, with 10 tickets for 55 cents, cash fare or tickets good on connecting or inter-

secting lines within the city. It is contended that this action of the company was without legal authority. Whether this was authorized or not, is not an issue involved in this case, and we express no opinion concerning it. The matters involved in this bill concern the validity of the ordinance passed August 9, 1918.

It is further alleged that Detroit is a city of a population exceeding 750,000; that it is an industrial city with much the larger part of its male population employed in industrial plants within and adjacent to the city; that the operation of the company's railway system was the only means of transportation of such employees from their homes to their places of employment, and that the interruption of the operation of the company's system, or the separation in operation of the franchise from the non-franchise lines, would paralyze the industrial and business life of the city, throw thousands of its residents out of employment, and result in shutting down its industrial plants and factories. Allegations follow setting forth the value of the company's property, and stating that the effect of the ordinance, if enforced, will be to require the operation of the company's system at a deficit, and, consequently, with no return on the investment.

The learned district judge answered the contention of the company by holding, in substance, that as to the non-franchise lines the remedy of the company was to abandon the service and take its property from the city streets, and that as to the franchise lines the exception of the fifth section of the ordinance saved the company's contract rights from impairment. There can be no question that it was within the city's power to compel the company as to its non-franchise lines to remove its tracks from the streets of the city. This was settled in *Detroit United Railway* v. *Detroit*, 229 U. S. 39. The city did not do so. Instead of taking such action it passed the ordinance in controversy, providing for the continued operation of

the company's system.    This ordinance has application
to the entire street railway system.    In section one it pro-
vides that no more than 5 cents shall be charged for a
single ride, or 6 tickets for 25 cents, for one continuous trip
through the city over any line operated without a fran-
chise.    Section two purports to preserve the right to
charge franchise rates when fixed by contract.    Section
three provides for fares, 8 tickets for 25 cents, except when
such fares are contrary to contract rights.    Section four
provides that where a trip is over two or more lines,
whether franchise or not, the maximum fare shall be 5
cents, or 6 tickets for 25 cents, and no transfers shall
be exacted which raise these rates of fare.    Section five
defines a continuous trip to mean a journey from one point
in the city to another, whether on one car line or by means
of transfers, and the company is required to furnish
transfers to carry the provisions of the ordinance into
effect.    It is further provided that the ordinance is not to
be construed as an attempt to impair the obligation of any
valid contract, but shall apply to all street railway pas-
senger traffic in the city except when the same is gov-
erned by the provisions of a contract.    Section six provides
for fines or imprisonment for violations of the provisions
of the ordinance.    Section seven provides that the ordi-
nance shall be in effect for the term of one year from Au-
gust 9, 1918, unless sooner amended or repealed.

The allegations of the bill, which for the present pur-
poses must be taken as true, are ample to the effect that
the enforcement of this ordinance will result in a deficit
to the company.    We cannot construe the exception of
section five, having reference to existing franchise con-
tracts, in such way as to modify the requirements of
section four which in explicit terms fixes the fares for
trips over two or more lines whether franchise lines or not,
and limits the maximum fare without charge for transfers.
This must be read in view of the definition of a continuous

trip in section five, as meaning a journey from one point to another point in the city whether the same is made on one car line or by means of transfers from car to car or from line to line.   The exception in section five can have no further effect consistently with the other provisions of the ordinance, particularly those of section four, than to regulate fares where trips are wholly upon franchise lines.   A principal ground upon which the bill was dismissed by the District Court was the view of the learned judge that the power to compel the company to remove its tracks from the streets involving the non-franchise roads included the right to fix terms of continued operation upon such lines, whether remunerative or not.   We cannot agree with this view.   In our opinion the case in this respect is ruled in principle by *Denver* v. *Denver Union Water Co.*, 246 U. S. 178.   In that case the franchise of a water company had expired, and the city might have refused the further use of the streets to the company. Instead of doing this it passed an ordinance fixing rates and requiring certain duties of the company.   We held that in that situation the company was entitled to make a reasonable return upon its investment.   So here, the city might have required the company to cease its service and remove its tracks from the non-franchise lines within the city.   Instead of taking this course the city enacted an ordinance for the continued operation of the company's system, with fares and transfers for continuous trips over lines composing the system whether the same had a franchise or not.   This action contemplated the further operation of the system, and fixed penalties for violations of the ordinance.   By its terms the ordinance is to continue in force for the period of one year, unless sooner amended or repealed.   This was a clear recognition that until the city repealed the ordinance the public service should continue, with the use of the streets essential to carry on further service.   Within the principles of the

*Denver Case* this service could not be required without
giving to the company, thus affording it, a reasonable
return upon its investment. In the *Denver Case* we said:
"The very act of regulating the company's rates was a
recognition that its plant must continue, as before, to
serve the public needs. The fact that no term was speci-
fied is, under the existing circumstances, as significant
of an intent that the service should continue while the
need existed as of an intent that it should not be perpet-
ual."

In the present case the service upon the terms fixed in
the ordinance is continued for a year, the city reserving
the right to repeal the ordinance at any time.

It is clear that the city might have taken a different
course by requiring the company to remove its tracks from
the non-franchise lines; it elected to require continued
maintenance of the public service, doubtless because it
was believed that it was necessary in the existing condi-
tions in the city to continue for a time at least the right
of the railway company to operate its lines. This
amounted to a grant to the company for further operation
of the system, during the life of the ordinance. For this
public service it was entitled to a fair return upon its
investment. Elements to be taken into consideration
in valuing the property of the company in estimating
a fair return are not involved in this case. If the allega-
tions of the bill are true, and for present purposes they
must be so regarded, the continued operation of the rail-
road system of the company upon the fares fixed in the
ordinance will result in a deficit, and deny to the com-
pany due process of law within the meaning of the Federal
Constitution.

As rates of fare are fixed on some of the existing fran-
chise lines at 5 cents without transfers, it would follow
as to continuous trips over such franchise and non-fran-
chise lines, such trips comprehending much of the trans-

portation required, the latter lines would be without compensation for the service rendered.  Furthermore, when a continuous trip begins on a non-franchise line and is over a franchise line and a non-franchise line, the former having the right to charge 5 cents for a trip over it, the effect would be to impair the obligation of the franchise contract.  *Detroit United Railway* v. *Michigan*, 242 U. S. 238.

In our view the allegations of this bill for the purposes of the demurrer sufficiently alleged violations of the Constitution of the United States in the action of the city in passing and enforcing the ordinance in controversy.  The District Court should have entertained the bill, heard the application for a temporary injunction, and proceeded to a hearing and determination of the case in due course.

*Reversed.*

MR. JUSTICE CLARKE dissenting.

The relation between the city and the railway company, when the ordinance which the court holds unconstitutional was passed, was this:

The company owned three classes of tracks, viz:

(a) Those in the business and residence streets most productive of traffic, constituting the greater part of the lines of the company.  Its authority to maintain these tracks expired in 1909–1910, and they are designated in the record as "Non-franchise lines."  It will be convenient to refer to the streets in which these lines are located as "Non-franchise streets."

(b) Tracks designated as "Three-cent franchise lines," (Exhibit "T"), also largely in business and important residence streets.  The company had franchises for these lines under which it was obliged to sell eight tickets for twenty-five cents good from 5.45 a. m. to 8 o'clock p. m. and six tickets for twenty-five cents good during the

remainder of the twenty-four hours. Such tickets entitled the holders to transfer privileges only on all three-cent lines.

(c) Disconnected sections of track, of small mileage, in streets remote from the business parts of the city. For these lines the company had unexpired franchises granted by villages and townships before the extension of the city limits included them, which allowed a fare of five cents, in some places, in others five cents with transportation to the City Hall. The mileage of these grants varied from five miles to "six blocks" in length, they are described in the bill as lying, some to the north, others to the south, others to the east and others to the west of the city, as it was when the grants were made and, thus widely separated, they had no connection one with the other, except over non-franchise or three-cent franchise tracks. These are designated as "Five-cent franchise lines."

It was stated at the bar by counsel for the city, and not questioned, that there were about one hundred and fifty miles of non-franchise lines, about sixty-five miles of the three-cent franchise lines, and only fifty-five miles of five-cent franchise lines.

In their brief counsel for the company say that the larger part of the company's lines had been operated for several years prior to December, 1917, on what was known as the "Day-to-day agreement," (and see *Detroit United Railway* v. *Detroit*, 229 U. S. 39, 42), under which a rental was paid to the city for the use of the streets and the company was allowed to charge a cash fare of five cents or seven tickets for twenty-five cents, except during an hour and a half in the morning and one hour in the evening, when tickets sold eight for twenty-five cents were accepted. For these fares transfers were given over the entire lines of the company. Either party could withdraw from this arrangement at any time, and in December,

1917, the company did withdraw from it and thereafter was allowed to charge, on other than its three-cent franchise lines, a cash fare of five cents, but with eight tickets for twenty-five cents, good for one and a half hours in the morning and for one hour in the evening. Universal transfers were allowed for these fares.

This arrangement continued until August 2, 1918, when, not satisfied, the company proposed to the city a five-cent fare with a charge of one cent for a transfer over all lines in the city one-fare zone, or, in the alternative, a six-cent fare with ten tickets for fifty-five cents and universal transfers, the franchise rates on the three-cent lines to continue, except that for the fares last named universal transfers would be given.

This proposal the city rejected and thereupon the company, without any authority from the city, put into operation the second proposal above stated, allowing transfers over any connecting or intersecting line within the city limits. In response to this action of the railway company the city passed the ordinance which, for two reasons, the court has held invalid, viz:

(1) Over certain of the franchise lines a five-cent rate of fare without transfers was provided for in the grants, and because section four of the ordinance required transportation "where a trip is over two or more lines, whether franchise lines or not," without transfer charge, it is held that, if this provision were enforced, the effect would be to impair such five-cent franchise contracts and that the ordinance is therefore void.

(2) Interpreting the ordinance as a grant to the company of the right to operate its lines, franchise and non-franchise, at rates which the bill alleges to be non-compensatory, the court holds it invalid because it would deprive the company of its property without due process of law.

The case must be considered on the allegations of the

bill as if on demurrer and my reasons for dissenting from both of these conclusions of the court are as follows:

As to the first. It is not anywhere alleged in the bill that the "Five-cent franchise lines" (no complaint is made as to the 3-cent lines) can be operated separately and prof- itably or that less income would be realized from them if operated under the terms of section four in conjunction with the non-franchise lines than if they were operated as separate properties, if such thing be possible, charging the five-cent franchise rate without transfers. With- out such an allegation it is pure conjecture to say that the company would suffer loss and that its contract would be impaired by giving effect to section four. He who would strike down a law must show that the alleged unconsti- tutional feature injures him and operates to deprive him of rights protected by the Federal Constitution. *Plym- outh Coal Co.* v. *Pennsylvania,* 232 U. S. 531, 534.

But the bill not only fails to allege that the railway com- pany would suffer loss from giving effect to section four, but it states facts which render it highly probable, if not entirely clear, that it would benefit by it.

All five-cent franchise lines appear from the bill to be, as we have said, outlying, of limited mileage, and so wholly disconnected one from the other that it would not be practicable to operate them profitably, if at all, except in connection with non-franchise lines. The record shows that in the past they have been so operated, with mutual transfers, and both of the proposals of the company made to the city on August 2, 1918, contemplated such opera- tion. In the absence of allegation to the contrary, the reasonable inference from this description of the five-cent franchise lines and this practice with respect to them is, that it is not practicable to operate them profitably as separate properties and that whatever value there is in them must be realized by operating them jointly with the non-franchise lines, with mutual transfers, and that the

company would be benefited, and not injured, by being permitted to so operate them under section four.

But, should this section four be construed to prescribe a rate for transfer over franchise lines?

The first section, as printed in the margin of the court's opinion, prescribes a charge "for one continuous trip within the city over any line *which is now operated* or shall hereafter be operated, *without a franchise fixing the rate of fare.*"

Clearly this is intended not to apply to the franchise lines.

The second section declares that the charge over franchise lines shall not be greater than is fixed in the franchise.

This plainly contemplates allowing the full franchise rate where one exists.

Section three provides for the special or "workingmen's" tickets but carefully excepts from its application "all lines . . . where such sale would be contrary to the terms of a franchise contract."

Section five in terms declares "the provisions of this Ordinance shall not be construed as an attempt to impair the obligation of any valid contract, but shall apply to and govern all such street railway passenger traffic in the city, except where the same is governed by the provisions of such contract."

Thus we have in the ordinance a declaration that the rate prescribed shall apply only to non-franchise lines, that the franchise rate shall apply on all franchise lines, that special ticket rates shall not apply where they conflict with franchise rates, and in addition there is the general declaration that the city council is intending to deal with non-franchise lines only, and that the ordinance shall not be so construed as to impair franchise contracts.

To this we must add that, it is clear that, excluding the five-cent franchise lines, this section four would still have

a large and indisputably valid application to both non-franchise and franchise lines. The ordinance was designed to apply to 150 miles of non-franchise lines, extending in all directions throughout the city, and to regulate transfers between various parts of these lines. In addition to this, the three-cent franchise lines are greater in extent and much more important than the five-cent franchise lines. From December, 1917, to August 2, 1918, transfers were allowed over all of the non-franchise lines and between the five-cent and three-cent franchise lines and the non-franchise lines upon payment of the fare prescribed in section four—five-cent fare, or six tickets for twenty-five cents —and it was plainly the primary purpose of the section to continue this rate and practice and not to permit the charge to be increased to six cents, as contemplated in the proposal of the company to the city of August 2, 1918. No complaint is made of the application of the section to the three-cent franchise lines.

All of this is overlooked by the court, and laying hold of the possible loss to the company (wholly improbable as we have seen) through the application of the section to the five-cent lines, the entire ordinance is struck down as unconstitutional.

This judicial power of declaring laws unconstitutional is of so high and delicate a character that it has been often declared by this court that it would exercise it only in clear cases, *Fletcher* v. *Peck*, 6 Cranch, 87, 128; *Fairbank* v. *United States*, 181 U. S. 283. Every possible presumption is in favor of a statute and this continues until the contrary is shown beyond a rational doubt, *Sinking-Fund Cases*, 99 U. S. 700, 718. The violation of the Constitution must be "proved beyond all reasonable doubt," *Odgen* v. *Saunders*, 12 Wheat. 213, 270; *Nicol* v. *Ames*, 173 U. S. 509, 515.

But if it be assumed that the application of section four would result in loss to the company and would impair

its five-cent franchise contracts, even then it would seem that the section should be annulled only in so far as it might be applied to such grants and that the remainder, which is not assailed, should be permitted to stand, under the rule of this court applied from *Bank of Hamilton* v. *Dudley*, 2 Pet. 492, 526, to *St. Louis Southwestern Ry. Co.* v. *Arkansas*, 235 U. S. 350, that if only part of an act be unconstitutional the provisions of that part may be disregarded and full effect given to the remainder, if severable from the unconstitutional part of the act, as it clearly is in this case.

Coming now to the second and more fundamental ground, on which the court proceeds to its conclusion. It is held that the ordinance contemplates the continued operation of the non-franchise lines, and therefore, applying the novel doctrine of the *Denver Union Water Company Case*, 246 U. S. 178, that it is a grant which, if given effect, would necessarily deprive the company of its property without due process of law, since the allegations of the bill are that it would be non-compensatory.

We are now dealing, not with an alleged attempt on the part of the city to require the company to operate its five-cent and its three-cent franchise lines at a loss, but with an offer to it of a right to operate the lines in the non-franchise streets, in which it has no rights, in conjunction with its other lines at what is alleged to be a non-compensatory rate for the entire system. The right of the company to operate the five-cent and three-cent lines was complete without the ordinance and the operation of them, as separate properties, was quite unaffected by it.

In defining the relation between the city and the company as it was before the ordinance, which is declared invalid, was passed, the court holds, as it must (229 U. S. 39), that the company had no rights in the non-franchise streets, and that the city had the right to order its tracks taken out of them.

This being the legal relation between the two parties, the company, on August 2, 1918, made its proposal for increased fares, which was rejected by the city. This proposal, when followed by rejection, obviously did not change the relation of the parties from what they were before it was made.

Thereupon the city made its counter-proposal by tendering the ordinance rates to the company, which promptly rejected them. It seems equally clear that this proposal and the rejection of it did not change the relations of the parties and that they continued precisely as they were before and as they were defined in the opinion of the court—the railway company without any rights whatever in the non-franchise streets. But, not so says the court, for the reason that the ordinance implies that the lines are to be operated and, under the *Denver Case*, it must therefore be interpreted as a grant, (contrary it would seem to *Blair* v. *Chicago*, 201 U. S. 400, 463), and, since it is alleged that the rates prescribed are non-compensatory, it is an invalid grant.

If it be conceded that the ordinance is in terms a grant, yet since every grant implies and requires a grantee, when the company refused to accept it the grant necessarily failed. It is obvious and elementary that no person or corporation can be made a grantee against his or its will. Kent Com., 13th ed., vol. 4, p. 455, note b. Thus, again, even on the assumption of the court, it would seem that the ordinance failed to change the relations of the parties from what they were before.

The conclusion of the District Court that this case can be distinguished from the *Denver Union Water Company Case*, and therefore is not to be ruled by it, seems sound, but the distinction need not be discussed.

The application of the principle of that case to this one must result in depriving the city of the power to treat with the company for terms for the operation of the tracks

which it owns in the streets in which its franchises have expired and in which this court has decided it has no rights whatever, except upon terms as favorable to the company as it would be entitled to if it had a valid and continuing grant to operate in them. The utmost that can be claimed for the ordinance is that it suffers the company to use streets which it could not use at all without it,—for the company to use them in any other way than as thus permitted would be unlawful. Yet this mere offer of this naked privilege, in terms revocable at will, and rejected by the company, is held to give a constitutional right and at the same time to so violate that right as to render the ordinance invalid. I cannot bring myself to understand how, except by sheer assertion of power, even the apparent justice of the result which it is hoped thus to obtain can be made the basis for creating a constitutional right where no right whatever existed before the passing of this rejected ordinance.

If the management of the company was misinformed as to the effect of the expiring of its franchises, as seems probable (229 U. S. 39), or if it underestimated the difficulties in the way of securing an extension of them, the result, as declared by this court in the case just cited, was to deprive the company of all legal rights in the non-franchise streets, and while its misfortune may be regretted, the apparent hardship of the situation is no valid ground for raising a constitutional right in favor of one of the parties, which will result in depriving the other party of an advantage which has lawfully come to it. Substantial justice is more likely to result from trusting to the sense of fairness of a community in dealing with such cases than from imposing upon a city a contract which a court shall make for them. The language used by Mr. Justice Holmes, when dissenting in the *Denver Case,* 246 U. S. 196, is sharply applicable to this case, *mutatis mutandis:* "We must assume that the Water Company

may be required, within a reasonable time, to remove its pipes from the streets. *Detroit United Railway* v. *Detroit,* 229 U. S. 39, 46. . . . In view of that right of the City, which, if exercised, would make the Company's whole plant valueless as such, the question recurs whether the fixing of any rate by the City could be said to con- fiscate property on the ground that the return was too low. . . . The ordinance of the City could mean no more than that the Company must accept the City's rates or stop—and as it could be stopped by the City out and out, the general principle is that it could be stopped unless a certain price should be paid."

For the reasons thus stated, I think that the ordinance is valid, and that the judgment of the District Court should be affirmed, and therefore I am compelled to dissent from the opinion and judgment of the court.

I am authorized to say that MR. JUSTICE HOLMES and MR. JUSTICE BRANDEIS concur in this opinion.