JAMAICA GAS LIGHT CO., Plaintiff, *v.* LEWIS NIXON, Constituting the Public Service Commission of the State of New York for the First District, DENIS O'LEARY, as District Attorney of the County of Queens, CHARLES D. NEWTON, as Attorney-General of the State of New York, Defendants.

(Supreme Court, New York Special Term, February, 1920.)

**Injunctions — when motion for a preliminary injunction denied — statutes — constitutional law — gas companies — evidence.**

In an action to have a statute fixing a gas rate declared unconstitutional on the ground that as to plaintiff it is confiscatory of its property, and to restrain its enforcement, the plaintiff's right to a preliminary injunction depends upon whether the

evidence set forth in the moving affidavit read in connection with the opposing affidavits establishes a clear right to the relief sought.

Where in an action brought by a distributing gas light company to have declared unconstitutional as to it the statute (Laws of 1906, chap. 125) which provides *inter alia* that a corporation engaged in the business of selling or furnishing illuminating gas in the fourth ward of the borough of Queens, where plaintiff's business is located, shall not charge or receive more than one dollar per one thousand cubic feet of gas, the plaintiff's proofs on its motion for a preliminary injunction to restrain the enforcement of the statute are not so clear as to justify the conclusion that the existing rate of one dollar is confiscatory of plaintiff's property, the motion will be denied.

MOTION for a temporary injunction.

Cullen & Dykman, for plaintiff.

Terence Farley, for defendant Lewis Nixon.

Denis O'Leary, for defendant Denis O'Leary, district attorney.

Charles D. Newton, attorney-general, for defendant state of New York.

John P. O'Brien and Judson A. Hyatt, for city of New York.

GREENBAUM, J.  The plaintiff moves for a temporary injunction, to be effective during the pendency of this action, which is brought to have declared unconstitutional as against itself, chapter 125 of the Laws of 1906, restraining the defendants from enforcing the provisions of an enactment which fixed at one dollar per 1,000 cubic feet the price of gas in the fourth ward of the borough of Queens, where the plaintiff's business is located.  At the outset it is to be observed that the plaintiff does not manufacture any gas.  It is a distributing company, which purchases its gas from the Brooklyn Union Gas Company.  Prior to 1897 the

Supreme Court, February, 1920.     [Vol. 110.

plaintiff manufactured its own gas. In that year its capital stock was acquired by the Brooklyn Union Gas Company. Upon purchase of this stock the manufacturing plant of the Jamaica company was dismantled, and thereafter the plaintiff only sold gas, which it purchased from the Brooklyn company. Two other companies in the fourth ward of Queens county, doing business respectively under the names of the Richmond Hill and Queens County Gas Light Company and the Woodhaven Gas Light Company, which are also controlled by the Brooklyn company, also distributed gas purchased from that company. The central office of these three distributing companies is located at No. 176 Remsen street, borough of Brooklyn, where the general books of the plaintiff are kept in charge of the auditor of the Brooklyn company. The plaintiff has also a local office at Jamaica used in common by the three distributing companies, the expenses of which are divided among them. Since 1897 directors of the plaintiff company were officers of the Brooklyn company. In a proceeding before the Public Service Commission affecting the Newtown company, the relations of these three companies to the Brooklyn company were thus officially detailed in an opinion of the commission (7 P. S. C. Rep. 1st Dist., New York, 101): " These three companies, together with the Newtown company, constitute a part of the distributing system of a great parent company, the Brooklyn Union Gas Company. And it is a parent company in the truest sense of the word. It maintains the most absolute control and ownership over them. The four companies are more than subsidiaries as that word is ordinarily used. They are the very limbs of the Brooklyn Union Gas Company. There is an absolute and inextricable identity of interests. The four small companies supply gas to the second and fourth wards but nom-

Misc.]          Supreme Court, February, 1920.

inally. They are nothing more than paper corpora-
tions, convenient operating divisions of the Brooklyn
Union Company, which owns every share of their stock
and has advanced every penny invested in them. No
private investors own a share of their stock or are
interested in one of them. The outstanding securities
of the Brooklyn Union constitute the only connecting
link between the investors and these four companies.
None of them manufacture a foot of gas, and all that
they distribute is made at and comes from the works
of the Brooklyn Union Company, which company
picks from among its employees the officers of the
small companies, whose salaries, together with other
general expenses, are arbitrarily divided and appor-
tioned among the Queens companies and are at the
most simply bookkeeping entries.'' It is well settled
that before a rate will be deemed unconstitutional the
complainant must establish confiscation by evidence
which is convincing beyond a fair doubt. *Detroit
United Ry.* v. *City of Detroit,* 248 U. S. 429, 442;
*Willcox* v. *Consolidated Gas Co.,* 212 id. 19;
*Minnesota Rate Cases,* 230 id. 352, 452. Plaintiff's
right to a preliminary injunction therefore depends
upon whether the evidence set forth in the plain-
tiff's affidavit, read in connection with the opposing
affidavits, clearly establishes a right to the extraor-
dinary relief sought. Experience demonstrates that
the ascertainment of the fair value of capital
invested in extensive business, the cost of produc-
tion and expenses of distribution, is ordinarily best
reached upon the trial of the issues, where the
witnesses *pro* and *con* may be subjected to cross-
examination, and where the books and documents used
in the business may be critically analyzed. Conclusions
of fact, although entirely proper in a pleading, have
scanty weight in an affidavit used upon a motion like

this. The affidavit should state facts within the personal knowledge of the affiant, and as to which he would be a competent witness upon the trial. The affidavits of plaintiff's vice-president, so far as they relate to the material facts to be considered upon this motion, largely consist of conclusions of fact and references to findings of the public service commission in various proceedings before it affecting the plaintiff. The most important contribution from these affidavits is the affiant's acquiescence for the purpose of this motion in the commission's valuation of plaintiff's capital as of December 31, 1913, at $402,339.89. It also appears therefrom that the amount of $143,044.56 was expended for capital account since that date up to August, 1919, and that if approximately the sum of $44,000 be deducted for depreciation and an adequate allowance be made for working capital and land values, the rate base on August 31, 1919, on which the fair return in this case would be calculated, would be the sum of $585,000. Other items as to which the vice-president may be deemed competent to testify from his own knowledge are the prices paid for the gas purchased of the parent company, the distribution and other expenses of the plaintiff, and its revenues derived from the sale of gas to its customers. So much of the vice-president's affidavits as deal with the cost of manufacture of the gas is purely hearsay, admittedly derived from information imparted by the president of the Brooklyn Union Gas Company. A study of the affidavits of the president of the Brooklyn Union Gas Company discloses that he refers to the findings of the public service commission made in May, 1916, to the effect that the fair and reasonable price to be charged by that company to the three distributing companies in the fourth ward of Queens county was about forty-three or forty-four

cents per 1,000 cubic feet, based upon the assumption that the cost of production to the parent company was about twenty-six cents per 1,000 cubic feet. The difference of eighteen cents between the assumed production cost and the forty-four cents assumed by the commission as a reasonable charge for gas to the plaintiff, it is alleged, was made up of " allowances found by the commission to cover a return upon that portion of the capital of the Brooklyn company devoted to the production of gas sold to the Jamaica company, general expenses and amortization and taxes." Such an allowance is approximately two-thirds of the production costs. No figures or facts are stated from which one may form a judgment as to the propriety of an addition of eighteen cents to cost production. Nowhere is there any evidence adduced as to the valuation of the capital of the Brooklyn Union Gas Company, nor of the amount expended by it for actual cost of production. There is an averment by the president that ." in 1917 the production cost to the Brooklyn Company increased to 35.53 cents, and in 1918 to 44.61 cents, and for the first eight months of 1919 to 50.66 cents," but there are no supporting facts in verification of his assertions. He testifies of his own knowledge as to the cost of oil, coal and labor for the years 1917, 1918 and the eight months of 1919, stating that in 1917 these three items aggregated thirty-two and fifty-two one-hundredths cents per 1,000 cubic feet; in 1918, forty-one and fifty-six one-hundredths cents, and for the eight months in 1919, forty-six and forty-six one-hundredths cents. He also states that the oil for 1920 has been contracted for at a price of one cent increase per gallon over the sum paid in 1919. The principal affidavit submitted in behalf of the defendants is that of Mr. Weber, the chief statistician of the defendant public service commission. It appears

therefrom that as to the figures for the first eight
months of 1919 no report of the operations of the
plaintiff had as yet been filed, but that as to the pre-
ceding years he is entirely familiar with the plaintiff's
annual reports filed with the commission from 1908 to
1918, both dates inclusive, purporting to give '' the
direct cost of manufacturing gas furnished to the
plaintiff.'' These show that in 1914 the cost was
stated to have been twenty-nine and nineteen one-hun-
dreths cents per 1,000 cubic feet; in 1915, twenty-six
cents; in 1916, twenty-six and fifty-two one-hundredths
cents; in 1917 thirty-five and seven one-hundredths
cents and in 1918, forty-four and ten one-hundredths
cents. Attention is also directed to the records of the
commission, which show that the practice of the Con-
solidated Gas Company system of Manhattan borough
for nearly twenty years was to furnish gas to dis-
tributing companies in its system under what are
called agency agreements, which provide '' for the
payment of direct production cost, plus ten per
cent,'' and that '' The New York Mutual Gas
Light Company has supplied millions of cubic feet
of gas to the Consolidated Gas Company at a price
which, since 1904, has not exceeded 37 cents per M.
until 1918, at which time there was an additional allow-
ance ' for use of manufacturing capacity,' but such
allowance amounted to less than 6 cents per thou-
sand.'' It is also averred that plaintiff's sworn report
filed with the commission for the year 1918 shows that
the total income available as return for investment,
without eliminating improper or doubtful items,
amounted to $59,729.83, a sum equal to a return of
ten and three-tenths per cent upon a rate base of
$580,000. This report for 1918 was based upon a
charge for gas paid to the parent company of fifty
cents, which it now claims should have been at the rate

of sixty-two and one-half cents per 1,000. The plaintiff's vice-president, in a supplemental affidavit, calculates the net income of the plaintiff for the year 1918, based upon the assumption that sixty-two and one-half cents per 1,000 would have been a fair charge for gas during that year, at $1,819.28. The commission's expert, however, denies the correctness of the plaintiff's assumption, and alleges that even at the higher rate the company's net income would have amounted to $21,006.79. Among the items included in the expenditures for 1918 by plaintiff, which are attacked by the defendant public service commission, is one of $21,762.89 for taxes, which he states is in reality a mere estimated liability, and has not yet been paid. That item he also states includes the sum of $7,000 as an estimate of the federal income tax, and the further sum of $11,475.21, an assessment for special franchises, which is a figure much larger than in former years, and the fairness of which is disputed by the plaintiff, and has not yet been judicially determined. It is also asserted that the state tax commission increased the value of the special franchise upon the assumption that the recent profits of the plaintiff have been higher than the average normal rate of profit in similar enterprises. It is therefore doubtful what the outcome of the controversy over this assessment may be. The defendants contend that the federal income tax is an excess profit tax, which may not properly be included as an expense of the company. It is the court's opinion that no excess profit taxes may be properly included as an expense. A profit tax in its very terminology implies a tax on profits as such. It is the amount reached after payment of all expenses, and therefore cannot be treated as an expense. In the returns to the government, upon which the profits tax is based, assuredly the amount of tax is not included

in the expenses of the business. The theory of **this** tax is that he who has secured the profits surrenders or returns a portion thereof to the government. Stated another way, the plaintiff must contribute to the government in common with others from its profits, as such, its share towards defraying the expenses of the war. It should, therefore, not be permitted to reimburse itself from its customers because of such contribution. The elimination of the federal income tax item and a possible reduction in the assessment for special franchises would materially increase the returns for 1918. The criticism as to these items would also apply to 1919. The allegation that the plaintiff company and the Brooklyn Union Gas Company had agreed upon sixty-five cents per 1,000 for gas for the year 1919, as against fifty cents for 1918, is not sufficient to establish as a fact that such a sum is a fair price. And where the agreement is in effect made with oneself it is open to the suspicion that it is not fair to the consumer by the reason of the self-interests of the so-called contracting parties. It is incumbent upon the plaintiff to establish the fairness of such an agreement by most convincing proof. To determine whether it is fair, it is essential to present evidence of the fair valuation of the Brooklyn Union Gas Company's capital, of the expenses necessarily and economically incurred in the manufacture of gas, and of the costs of the commercial administration of its business. Besides, it does not appear how the expenses are apportioned as between the various distributing companies allied with the Brooklyn Union Gas Company and that company. There can be no reasonable doubt that during the years 1918 and 1919 the expenses of manufacturing gas were considerably increased by the advanced price of oil and coal. But notwithstanding that fact, the year 1918

showed a substantial profit upon investment, and it is not sufficient merely to prove increased cost of production. The extent of such increased cost is the vital thing to establish. It is true that for 1919 there was a further increase in the expense of oil, but that was an abnormal year, and the business experience of eight months is insufficient upon the meagre proofs before the court to justify it in finding confiscation upon affidavits. Moreover, from the undisputed facts, the sales of gas have increased yearly, and to what extent the increased cost of production will be enhanced by increased revenues is uncertain and, indeed, has not been touched upon. The plaintiff's proofs fail to present such a clear case as to justify the court in reaching the conclusion that the existing rate of one dollar is confiscatory of its property.

Motion denied.