## WESTINGHOUSE ELECTRIC & MFG. CO. v. BROOKLYN RAPID TRANSIT CO. et al.

### Petitions of GARRISON.

(District Court, S. D. New York. May 17, 1920.)

Nos. 48, 78.

1. **Street railroads** ☞49—Construction of lease.

Two clauses of a long-term lease of a street railroad system—(1) that on expiration or termination of the lease, lessor should pay lessee the actual cost of additions to the property and equipment made by lessee; and (2) that on its termination by breach by lessee a guaranty fund placed in trust by lessee "shall at once become the sole and absolute property of the lessor, and shall be paid * * * to the lessor, * * * not by way of penalty, but as liquidated and stipulated damages"—are to be construed together; and on insolvency of lessee and return of the property, lessor *held* not entitled to immediate transfer to it of the guaranty fund, regardless of its liability under the first clause, it being the intention of the parties to assure such fund to lessor, to the exclusion of claims of other creditors of lessee.

2. **Damages** ☞81—Stipulation in lease of street railroad for liquidated damages for breach valid.

A provision of a long-term lease of a street railroad system, that in the event of its termination by breach by lessee a guaranty fund provided by lessee should become the property of lessor as stipulated and liquidated damages, *held* valid and enforceable.

3. **Set-off and counterclaim** ☞35(1)—Claim capable of exact determination not unliquidated.

Under a provision of a lease of street railroad lines, that on expiration or other sooner termination of the lease lessor should pay the "actual cost" of improvements made by lessee, and which also provided a fund

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

to be paid lessor as liquidated damages, in case it was terminated through breach by lessee, where lessee became insolvent and surrendered the property, the actual cost of improvements made to that time is capable of exact ascertainment, and the claim therefor is not unliquidated, in such sense that it may not be set off against such fund.

**4. Courts ⬤⟲264(3)—Court has jurisdiction to determine controversies incidental to its receivership.**

The agreement of parties and the order of the court pursuant to which its receiver for the insolvent lessee surrendered street railroad property to the lessor *held* to vest the court with jurisdiction to determine all controversies arising out of such surrender or under the lease.

In Equity. Suit by the Westinghouse Electric & Manufacturing Company against the Brooklyn Rapid Transit Company and others. In the matter of petitions of Lindley M. Garrison, receiver, for instructions. Order entered.

See, also, 256 Fed. 456, 465.

For brevity the Brooklyn City Railroad Company will be referred to as Brooklyn City; the Brooklyn Heights Railroad Company, as Brooklyn Heights; Brooklyn Rapid Transit Company, as B. R. T.; and the Equitable Trust Company, wherever convenient, as the Equitable.

Carl M. Owen, of New York City, for receivers of Brooklyn Heights R. Co. and of Brooklyn Rapid Transit Co.

William D. Guthrie, of New York City, William N. Dykman, of Brooklyn, and Howard Van Sinderin, of New York City, for Brooklyn City R. Co.

Murray, Prentice & Howland, of New York City (Charles P. Howland, of New York City, of counsel), for Equitable Trust Co.

John L. Wells, of New York City, for committee of bondholders under Brooklyn Rapid Transit mortgage of 1895.

Stetson, Jennings & Russell, of New York City (Allen Wardwell, of New York City, of counsel), for Guaranty Trust Co.

Wingate & Cullen, of New York City (T. Ellett Hodgskin, of New York City, of counsel), for People's Trust Co.

Brower, Brower & Brower, of Brooklyn, N. Y. (George E. Brower, of Brooklyn, N. Y., of counsel), for Kings County Trust Co.

Cravath & Henderson, of New York City, for Central Union Trust Co. of New York.

Rushmore, Bisbee & Stern, of New York City, for committee of stockholders.

Scott, Gerard & Bowers, of New York City, for committee of bondholders.

MAYER, District Judge. By petition, verified December 1, 1919, Lindley M. Garrison, as receiver of Brooklyn Heights, set forth the following:

That pursuant to the Brooklyn City and Brooklyn Heights lease (referred to infra) what is known as the guaranty fund was provided; that the guaranty fund consisted of various securities, in the petition set forth, deposited with Guaranty Trust Company, Brooklyn Trust

---

⬤⟲For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Company, the People's Trust Company, and Kings County Trust Company; that there was addressed to the receiver a letter from the People's Trust Company, dated October 15, 1919, and there was also addressed to the receiver a letter from Guaranty Trust Company, dated October 21, 1919. The letter from the People's Trust Company concluded as follows:

"You are respectfully requested, as receiver of the Brooklyn Heights Railroad Company, to advise the People's Trust Company of the course you desire it should take in respect to the demands which are above stated."

The letter from Guaranty Trust Company stated inter alia:

"We hereby advise you that request has been made of us by the Brooklyn City Railroad Company to apply the interest of the guaranty fund now in our possession as the same shall accrue and be collected, or so much of the principal of the said guaranty fund as may be proper for the following purpose."

The demands referred to in these two letters as having been made, respectively, by the People's Trust Company and Guaranty Trust Company, were for the payment of various taxes, and the payment of "the quarterly rental to October 1, 1919, amounting to $300,000; the Brooklyn Heights Railroad Company now being in default in the payment of the same." The point of these demands, information in regard to which was thus formally communicated to the receiver of Brooklyn Heights by the trust companies, was that Brooklyn City was treating the situation as the owner of the guaranty fund, entitled presumably to have such disposition made thereof as the Brooklyn City would require. The petition of the receiver of Brooklyn Heights concluded with the following words:

"Wherefore, in view of the demands made by these letters, and of the conflicting rights with respect to said guaranty fund, and other questions which may arise concerning the same, your petitioner prays that he may receive the instructions of the court in the premises."

This application came on to be heard on December 22, 1919. It is unnecessary to set forth in detail the proceedings upon that date, and the observations of court and counsel, all of which have been accurately transcribed and are fully contained in the record. Suffice it to say that it was clearly the intent of the parties, as well as the understanding of the court, that the consideration of the subject-matter would be postponed "without prejudice to existing rights, * * * but without tribulations or penalties being visited on the trust company during the period of that adjournment." After various adjournments, agreeable to all concerned, the matter of the petition for instructions supra came on to be heard on April 10, 1920, and was argued upon that date, and arrangements made for the submission of briefs. While this application was sub judice an application was made by Lindley M. Garrison as receiver of the Brooklyn Rapid Transit for certain relief (to be referred to infra) upon the ground, inter alia, that B. R. T., subject to certain rights, is the owner of the fund in question.

It will conduce to clarity to take up the applications in sequence, so far as practicable, and likewise to discuss the events in sequence, so

far as practicable. Upon the argument on April 10, 1920, there was submitted by Brooklyn City a paper which it designated as "Answer of the Brooklyn City Railroad Company to the Petition of the Receiver of the Brooklyn Heights Railroad Company (Application No.. 48) for Instructions with Respect to Certain Demands of the Guaranty Fund." The paper was verified on April 6, 1920, by Zerah E. Watson, secretary and treasurer of Brooklyn City, who states:

"I have read the foregoing answer, and know the contents thereof. * * *"

The paper commences:

"The answer of the Brooklyn City Railroad Company, answering the aforesaid petition, respectfully shows to this court as follows."

The answer, inter alia, alleges in the eighth paragraph that by reason of the default of Brooklyn Heights the guaranty fund—

"at once became the sole and absolute property of the lessor, not by way of penalty, but as liquidated and stipulated damages, and the trustee or trustees become forthwith obligated to pay and transfer the said fund, or any balance thereof, to the lessor, but the trustee or trustees have wholly neglected and refused to pay or transfer to the lessor any part thereof, although due demand in writing was made upon such trustees for such payment and transfer on or about December 24, 1919."

The answer of Brooklyn City concludes as follows:

"Wherefore your respondent, the Brooklyn City Railroad Company, prays that Lindley M. Garrison, as receiver of the Brooklyn Heights Railroad Company herein, be instructed in the premises as to said petition (Application No. 48) that neither he nor the said trust companies have any right, title, or interest in, or claim to, the said securities, and that accordingly this court decree that your respondent is entitled to the sole and absolute ownership and possession of the securities constituting the aforesaid guaranty fund, and that the trustees thereof, the Guaranty Trust Company, the Brooklyn Trust Company, the People's Trust Company, and the Kings County Trust Company, may be severally ordered and directed to deliver, pay, and transfer forthwith to your respondent all and singular the securities and bonds now on deposit with them, free and clear of any liens, incumbrances or claims of any sort or nature whatsoever; such delivery, however, to be without prejudice to the right or claim of your respondent to any deficiency between the real or actual value of said securities in the aggregate and the sum of four million dollars ($4,000,000), together with such further and other relief as to this court may appear just and equitable."

It will be noted, from the structure of the paper thus designated as an answer, that Brooklyn City not only submitted to the jurisdiction of the court upon this application, but asked for affirmative relief, in the same manner as would have been consistent with an original bill or with an answer under equity rule 30 (201 Fed. v, 118 C. C. A. v), had the application by the Receiver of Brooklyn Heights been a formal bill of complaint.

In the same proceeding Equitable filed what it designated as a "Petition of the Equitable Trust Company of New York for Leave to Intervene and Become a Defendant and to File an Answer and Cross-Bill." The petition referred, inter alia, to paragraph X of the Brooklyn City lease, and alleged on information and belief that the Brooklyn City was indebted to the Equitable as trustee in the amount of $13,-

125,059.75, or in some larger sum, by reason of extensions, etc., made under paragraph X. The petition further averred:

"That the securities comprised in said guaranty fund are, to the extent of their value and to the extent that they may be declared to be the property of the Brooklyn City Railroad Company, assets of the Brooklyn City Railroad Company available in payment pro tanto of the indebtedness due your petitioner, and that said guaranty fund and the securities comprised therein should be held by the several trustees thereof until the final adjudication of this court in the premises, or be delivered by said several trustees to Lindley M. Garrison, as receiver herein, to be by him held until such final adjudication.

"Your petitioner avers that unless it be permitted to intervene in this suit, and set up a defense and claim relating to said guaranty fund, any disposition thereof will be greatly to your petitioner's detriment and injury, and in violation of its rights as the holder and owner as trustee of the claim against the Brooklyn City Railroad Company for $13,135,059.75 under paragraph X of said lease of February 14, 1893."

To the petition was attached a proposed answer and cross-claim, and the petitioner concluded with the usual prayer for intervention, requesting that it be made a party defendant, and that leave be granted to file an answer and cross-claim in the form proposed. The relief asked for in the proposed answer and cross-claim is as follows:

"(1) That each of the trust companies holding some portion of said guaranty fund be directed to transfer the same to the receiver of the Brooklyn Heights Railroad Company, and that said receiver be directed to hold said guaranty fund until the further order of this court.

"(2) That the amount of the indebtedness of the Brooklyn City Railroad Company to this defendant as holder of a claim against said Brooklyn City Railroad Company, pursuant to the provisions of paragraph X of said lease of February 14, 1893, be adjudicated and determined, and that the matter be referred by this court to a special master for the purpose of determining the amount of such indebtedness.

"(3) That upon the coming in of the report of such special master fixing the amount of such indebtedness the receiver or other holder or holders of said guaranty fund be directed to dispose of the securities composing the same for the best possible price and in such manner as may be hereafter determined by this court, and that this court direct the net proceeds of such sale or sales to be paid to this defendant as trustee, to be held for the benefit of the bondholders of the first mortgage of the Brooklyn Rapid Transit Company, or to be credited by it upon the amount of indebtedness owed to it as trustee by the Brooklyn City Railroad Company as aforesaid.

"(4) That this defendant have such other, further, different, and general relief as may be just and equitable."

To the petition of the Equitable, Brooklyn City filed "Answer of the Brooklyn City Railroad Company to the Petition of the Equitable Trust Company of New York in the Matter of the Petition (Application No. 48) of the Receiver for Instructions with Respect to Certain Demands as to the Guaranty Fund." In the body of this paper, said paper is described as the "Answer of the Brooklyn City Railroad Company to the Petition of the Equitable Trust Company of New York Herein." The verification by Mr. Watson, dated April 6, 1920, sets forth: "I have read the foregoing answer. * * *" The answer in brief denies the various allegations of the petition of the Equitable and concludes with the following prayer:

"Wherefore your respondent prays that the petition of the Equitable Trust Company of New York herein be in all respects denied, and that an or-

der be entered herein denying its application to intervene as a party defendant in this suit, or to file an answer and cross-claim therein, and for such other and further relief as may be just and proper in the premises."

Thereafter under date of April 10, 1920, the court made an order which was filed April 12, 1920, the ordering part whereof is as follows:

"Ordered, that said petition be and the same is hereby granted, and that the petitioner, the Equitable Trust Company of New York, be permitted to intervene in the above-entitled cause, and to file an answer and cross-bill in the form attached to the above petition."

Answering the petition of the receiver of Brooklyn Heights, the Guaranty Trust Company filed a paper which is designated as an answer in the verification of one of its officers, and said paper concluded as follows:

"Wherefore Guaranty Trust Company of New York prays that it may receive the instruction of this court as to what disposition it should make of the said securities now in its hands as depositary, and further that said funds be charged with the lien, in favor of Guaranty Trust Company of New York, for its charges and expenses as depositary of the said fund."

A position similar to that of the Guaranty Trust Company was taken in open court by the People's Trust Company, Brooklyn Trust Company, and Kings County Trust Company, but no papers have been filed by them.

From the foregoing papers and statements in open court it is clear that the trust companies, which are depositaries, are willing to submit to the jurisdiction of this court, and have so submitted, so far as the controversy concerns them. It is similarly clear that the Equitable, as trustee, has willingly submitted to the jurisdiction of this court. It is equally clear that Brooklyn City did not specially appear nor challenge the jurisdiction of the court in relation to application No. 48. Counsel for Brooklyn City applied by letter, dated April 21, 1920, "for leave to file in the above matter, application No. 48, an additional affidavit * * * of Watson," and such affidavit was received and is a part of the record. This affidavit is verified April 20, 1920, and does not raise any question of jurisdiction.

The situation, therefore, after all of the papers in application No. 48 were before the court, was as follows: The receiver had asked for instructions; Brooklyn City had asked for affirmative relief in respect of the disposition of the fund in question; the custodians of the fund have asked the court for instructions in respect thereof; Equitable had answered the petition of the receiver and by way of cross-claim had asked for affirmative relief; and thus there were before the court all those who at that time seemed necessary for the disposition of the controversy. However, as later appeared, the receiver of the B. R. T. claims the fund by virtue of certain transactions subsequent to the making of the lease. It also seems that the B. R. T. receiver claims to be the owner of what is called the construction account and that the guaranty fund (in so far as concerns the interest of B. R. T. therein) and the construction account are pledged, and that certain liens are or will be asserted in favor, not only of the Equitable mortgage, but also

in favor of the B. R. T. first and refunding mortgage and B. R. T. consolidated and refunding mortgage of June 1, 1918.

The claim of some millions of dollars arising under paragraph X of the lease is familiarly spoken of as the construction account. Whether out of this somewhat complicated situation the Brooklyn Heights' receiver has any interest, legal or equitable, either in the guaranty fund or the construction account, is not clear, and obviously cannot be determined on the record as it now stands.

By petition verified April 26, 1920 (known as application No. 78), Lindley M. Garrison, as receiver of B. R. T., applied to the court for the following relief:

"(1) That the court adjudge that the Brooklyn City Railroad Company is not entitled as against the Brooklyn Rapid Transit Company to the possession of said guaranty fund, unless and until, among other things, it shall have paid the amount due to the Brooklyn Rapid Transit Company or your petitioner, as receiver thereof, with respect to the use of said cars, or with respect to any other existing claim or demand of the Brooklyn Rapid Transit Company, or your petitioner as receiver thereof, against the Brooklyn City Railroad Company.

"(2) That the court direct that the various trust companies, who, as trustees, are in the possession of portions of said guaranty fund, shall deliver the same into the custody of the court, or shall hold the same subject to the order and direction of the court in this case.

"(3) That the court direct the Brooklyn City Railroad Company to take no action or proceeding with respect to the said guaranty fund, except only such as may be permitted by this court.

"(4) That the court grant such other relief in the premises as the court may deem proper."

Paragraph 1 of the prayed for relief may be promptly disposed of as between the receiver of the B. R. T. and the Brooklyn City; the court having decreed that the title to certain cars is in the receivers of B. R. T. and that Brooklyn City shall pay reasonable compensation for the use of said cars. This part of the controversy must be considered disposed of as between the B. R. T. receiver and the Brooklyn City, and should not confuse any issues in respect of the guaranty fund questions, nor in respect of the construction account questions, as between the B. R. T. receiver and Brooklyn City. The remaining prayers of the petition, however, in conjunction with the petition itself, bring up some of the important questions here to be considered.

In respect of application No. 78, Brooklyn City has appeared specially, and has denied the jurisdiction of this court to make any order against it. Brooklyn City asserts that this court has neither power nor jurisdiction to impress any lien upon the securities constituting the guaranty fund, nor power or jurisdiction to direct the trust company custodians to deliver the securities to the custody of the court, nor to hold them subject to the order and direction of the court, and further the court has neither power nor jurisdiction to direct the Brooklyn City to take no action or proceeding with respect to the guaranty fund, except only such as may be permitted by the court.

[1] Passing for the moment questions of jurisdiction, which the applications and various papers and proceedings in connection therewith have developed, it is desirable to ascertain the rights of the

Brooklyn City as lessor and Brooklyn Heights as lessee under the lease of 1893, so far as relates to paragraphs X and XXXIX. These read as follows:

"X. The lessor further covenants and agrees that in the event of the expiration of this lease, or other sooner termination thereof, it will pay to the lessee the actual cost of all property, extensions, branches, additions, improvements, and equipments, made, acquired, and paid for by said lessee out of its own funds, for use in connection with the operations of the railroads of the lessor, less the cost of such part thereof as was required to preserve said railroads, extensions, additions, improvements, and equipments in good repair and serviceable condition, and less the cost of such part thereof as was necessary to preserve and secure efficiency in the operation of said railroad."

"XXXIX. The lessee further covenants and agrees that in the event of the termination of this lease by reason of any breach, default, or omission on its part in the performance of either or any of the covenants on its part to be kept and performed, the said guaranty fund of four million dollars ($4,000,000) deposited with the said trustee, or any balance thereof, shall at once become the sole and absolute property of the lessors, and shall be paid and transferred by said trustee or trustees to the lessor, its successors or assigns, not by way of penalty, but as liquidated and stipulated damages; and it is mutually agreed that, if this lease shall terminate otherwise than on account of the breach, default, or omission of the lessee, then the said four million dollars ($4,000,-000), or any balance thereof, shall be paid to the lessee."

The lease was dated February 14, 1893. It was for 999 years, and covered an extensive system of street surface transportation. It contemplated, of necessity, that during this long period of time there would be extensions, branches, additions, improvements, and equipments made and added by the lessors. The lease contemplated the usual alternatives: (a) Continued operation by the lessee, with the attendant payment of rental and the fulfillment of other obligations; or (b) cessation of operation and termination of the lease, with accompanying results.

It is difficult to read this lease and arrive at conclusion that its vital covenants were to be independent of each other. In respect of paragraph X it will be noted that the obligation of the lessor to pay to the lessee the actual cost of all property, extensions, etc., arose only "in the event of the expiration of this lease, or other sooner termination thereof." Obviously, so long as the lessee paid the rent and fulfilled the obligations of the lease, it could not call upon the lessor to pay for what the lessee had put into the property under paragraph X; but the clear intent of the parties was that, when the lease expired or was sooner terminated, the lessor under paragraph X was obligated to pay to the lessee the actual cost of all property, extensions, etc., for the simple reason that on such termination of the lease the lessor presumably would receive back its property, with added benefits.

This actual cost item of paragraph X might in the course of years reach a very substantial amount. Indeed, it is fair to assume that in a lease of this character and of such long duration the parties contemplated that the sums expended under paragraph X might aggregate a very large amount. The claim is that the amount of this construction account is some millions of dollars. Whether this claim is good or bad is at this stage of the controversy immaterial. It is enough that the claim is in excess of the guaranty fund, and it must be as-

sumed that, when the parties executed and delivered the lease, it was contemplated that claims arising under paragraph X might equal or exceed the amount of the guaranty fund.

[2] In order to afford proper protection to the lessor, paragraph XXXIX was inserted in the lease. It is plain that, if the lessor were called upon to sue for damages caused by a breach, which eventuated in the termination of the lease, it would be a matter of the greatest difficulty to prove such damages. This difficulty is inherent in a lease of this character, and paragraph XXXIX is so drawn that I am fully satisfied that the amount therein stipulated is to be regarded, not as a penalty, but as liquidated and stipulated damages. Sun Printing Association v. Moore, 183 U. S. 642, 22 Sup. Ct. 240, 46 L. Ed. 366; Wise v. United States, 249 U. S. 362, 39 Sup. Ct. 303, 63 L. Ed. 647.

The interesting question of construction which arises revolves around the words "shall at once become the sole and absolute property of the lessor, and shall be paid and transferred by said trustee or trustees to the lessor. * * *" It is the contention of Brooklyn City that the intent and result of this clause is to vest title in the lessor immediately upon the termination of the lease, if such termination is by reason of the breach of the lessee. According to Brooklyn City, when the lease in the case at the bar terminated, the custodians were obligated forthwith to turn over the securities, upon the theory that the property belonged under paragraph XXXIX ex proprio vigore to Brooklyn City. It will be noted, however, that the words "at once" do not apply to the words "shall be paid and transferred," unless it can be said that the words "at once" relate to all of the words which follow them, down to and including the word "damages."

I think the words "at once" are limited to the words "become the sole and absolute property of the lessor." But I do not place my conclusion on the mere collocation of words, nor on so narrow a ground. It seems to me that this language was not intended to require the immediate transfer of the guaranty fund to the lessor, but was intended to earmark and characterize the fund as against creditors or other claimants who would be entitled to share in the fund, if its title had not been carefully safeguarded. In other words, if this clause had merely stated that the $4,000,000 were to be regarded as liquidated damages, and not as penalty, then the Brooklyn City would have no greater rights in the disposition of this fund than any other creditor of the Brooklyn Heights similarly situated, and in such event the only value of the provisions would have been to fix the damage; but the fund itself would have been available for distribution to creditors other than the Brooklyn City to such extent and in such manner as the assets of the Brooklyn Heights might be marshaled and distributed.

It is fair to assume that it was contemplated by the parties that the lease would not be terminated by breach unless the Brooklyn Heights found itself financially incapable of carrying out its covenants. In such event the Brooklyn City wished to be certain that this fund would be so circumstanced that it alone would have resort thereto, free of claims of any other creditors. But I am unable to conclude that it was intended between the parties that the fund provided for under

paragraph XXXIX was to be paid over forthwith by the custodians, if claims under paragraph X were outstanding at the time of the termination of the lease. Both paragraphs speak as of the date of expiration or earlier termination of the lease. Neither the guaranty fund under paragraph XXXIX nor the construction account under paragraph X was payable prior to the termination of the lease. The rights under both paragraphs were to spring up at the same time. The lessee was to be reimbursed "actual cost" under paragraph X, no matter what the cause of termination. It was not to be penalized, even though it flagrantly breached the lease; for the construction account was to be paid, either in event of expiration "or other sooner termination" of the lease —i. e., a sooner termination for any reason.

[3] But it is said that the claim under paragraph X was unliquidated and might take years to liquidate, and that it cannot be assumed that the parties intended that the payment over of the guaranty fund should be delayed until the construction account was liquidated. The claim under section X is quite different, as regards liquidation, from the kind of claims referred to in cases like Matter of Coatsworth, 160 N. Y. 114, 54 N. E. 665, and Tallman v. Coffin, 4 N. Y. 134. In these cases it is the "value" of the improvements on the termination of the lease which is to be ascertained.

By virtue of paragraph X, the obligation of the lessor is to pay the "actual cost" of the improvements, etc. Such cost is capable of exact ascertainment as of the date of termination of the lease, and quite unlike the damages recoverable in tort or for certain kinds of breaches of contract. The point is that whether a claim is unliquidated in the sense that its amount is not agreed upon between the parties is here immaterial. The test is whether the claim may be ascertained with reasonable certainty as of a fixed day. Robinson v. United States, 251 Fed. 461, 466, 163 C. C. A. 637; Faber v. City of New York, 222 N. Y. 255, 118 N. E. 609. In this case, looking at the instrument alone, it is plain that the "actual cost" was capable of ascertainment as of a fixed day, and the fact that the parties differ as to the amount of the claim does not change the nature of the claim.

If there were no controversy as to the "actual cost" under paragraph X, can it be assumed that the parties intended that the guaranty fund could be paid over to the lessor forthwith by the custodians while the lessee would be compelled to sue, or wait for the payment to it of the sums it had expended for the "actual cost" of improvements, etc., which had enhanced the value of the lessor's property, and which might be equal to or in excess of the amount secured by the guaranty fund? Further, there is no evidence that the custodians accepted the guaranty fund under any obligations to pay over other than that expressed in paragraph XXXIX, as that obligation, so far as concerns the custodians, may be construed, looking to the paragraph alone.

Paragraph XXXIX is not an independent covenant in the sense considered in Matter of Coatsworth, supra. In that and similar cases the doctrine is that the lessee cannot withhold possession of the demised property until the lessee's improvements are paid for. In the case at bar, this doctrine might have been invoked, if the lessee had not sur-

rendered possession of the property until its claim under paragraph X had been paid, but no such procedure was adopted. I am of opinion, therefore, that, reading the lease as one instrument, its covenants are interrelated, and that it was not intended that as between the parties, or those succeeding to their title or rights, the claims under paragraph X should not be set off against the fund covered by paragraph XXXIX; in other words, that while the amount covered by paragraph XXXIX is ascertained, it is to be regarded as between the parties merely as a credit as against the amount, if any, due under paragraph X.

But, even treating the covenants as independent, the policy of the law has developed, so as to allow counterclaims in the same suit between the same parties, even though such counterclaims are independent, and do not arise out of the same transaction. Rolling Mill Co. v. Ore & Steel Co., 152 U. S. 596, 14 Sup. Ct. 710, 38 L. Ed. 565; United States Trust Co. v. Western Contract Co., 81 Fed. 454, 26 C. C. A. 472; Equity Rule 30 (201 Fed. v, 118 C. C. A. v); Vacuum Cleaner Co. v. American Rotary (D. C.) 208 Fed. 419.

All of the foregoing has been set forth to explain the instruction to the receiver hereinafter given. In the present state of the applications, it is plain that the situation is much confused. While answers and cross-claims have been interposed, these were all interposed on application for instructions; i. e., application No. 48 was so called, and application No. 78, while not so called, is such in effect. No bill of complaint in the true or technical sense has been filed. To decide that the subject-matter is in orderly fashion before the court, so that the court can make a binding adjudication, would set a precedent which would probably not only not stand on review, but which might tend to deprive the court of the assistance which it has received, and which has been freely given on applications for instructions, and which the court deems of great service in the many problems and complexities of the administration of these receivership estates.

The rights and title of the B. R. T. and of the Brooklyn Heights receiver, of the Brooklyn City, of the Equitable and other pledgees, and the duty of the custodians, should be determined in a litigation commenced and continued with pleadings in usual fashion. When such pleadings shall have been framed, and all necessary parties shall have been made parties to the litigation, the issues will be made, testimony taken, if necessary, and all concerned will be so positioned that any one aggrieved can seek a review of any judgment or decree, as the case may be.

[4] Such action or suit, whether begun by the Brooklyn City, or any one else, should be brought in this court. This was the clear intention when the arrangements were concluded (after many conferences between counsel and also with the court) whereby the lessor's property was turned back to it by the receiver of Brooklyn Heights. It was realized that there were many questions then known, as well as others which might thereafter arise, which could not be disposed of in the limited time within which the parties sought to bring about practical operation of the Brooklyn City without interruption of public service.

The receiver arranged to afford every accommodation available in the way of cars, employés, equipment, etc., to enable the Brooklyn City to operate at the earliest feasible moment after the default in the payment of rent on October 1, 1919. The spirit and intent of the parties was expressed by the court in its memorandum of October 16, 1919.[1]

See, also, order of October 20, 1919.[2]

The parties themselves agreed in paragraph twelfth of the agreement between the receiver of Brooklyn Heights and Brooklyn City as follows:

"Twelfth. It is recognized that, within the time available to the parties in the preparation of this agreement, it is impossible to foresee and provide for all of the matters incident to the delivery and surrender of possession to the City Company of its property, and the furnishing of adequate equipment,

---

[1] Memorandum.

The situation is such that from the practical standpoint, because of lack of funds, it becomes necessary that the receiver of the Brooklyn Heights Railroad Company no longer operate the lines covered by the Brooklyn City Railroad Company lease. Counsel for the Brooklyn City Railroad Company insists that, in view of nonpayment of rent and taxes, the property must be delivered by the Brooklyn Heights Railroad Company, or its receiver, to the Brooklyn City Railroad Company.

Under sections 3 and 7 of the decree signed herewith, the court intends that said decree herewith made shall be without prejudice in the fullest sense of the term as in said decree provided. The receiver, in his desire to protect his trust, is concerned as to whether or not it is necessary at this time to make a demand and tender a deed. Whether such requirement is necessary or not need not now be passed upon by the court; but the court, in order to preserve all the rights existing at and prior to the time the order is made, and as a matter of precaution, has directed the receiver to make the demand of the total sum alleged to be due, without at this time detailed particulars, and to tender a deed good and sufficient to convey to the Brooklyn City Railroad Company, its successors and assigns, all of the right, title, and interest of the lessee company in and to any additional property referred to in paragraph III of the decree, free and clear of all incumbrances.

I doubt whether it is necessary to tender such deed at this time under paragraph 24 of the lease, but I order the receiver to make the tender, so as to safeguard against any questions upon this point. I am confident that, when the time comes to determine the right of the parties, any court which will be called upon to deal with the subject-matter will consider all the facts and circumstances and the situation as it really existed when the necessities of the situation required the court to order the receiver not to pay rent and taxes, and to cease operation, and to cause the delivery of possession of the property to the Brooklyn City Railroad Company.

[2] Order.

The matter of the application of Lindley M. Garrison, receiver (No. 47), for instructions respecting various affairs of the Brooklyn Heights Railroad Company, came on further to be heard at this time, and was argued by counsel, and upon consideration thereof it was ordered, adjudged, and decreed as follows:

That the receiver is authorized to tender to the Brooklyn City Railroad Company, subject to any lien thereon, as property coming within the description of paragraph III of the previous order herein under this application, the 499 cars constituting the cars purchased by the proceeds of certificates of indebtedness No. 159, issued by the Brooklyn Heights Railroad Company to Transit Development Company, under date of July 1, 1918.

The court hereby reserves all other matters and things respecting this order for disposition pursuant to further hearing and the orders of this court.

facilities, power, etc., for the operation of the properties of the City Company; and it is intended that this agreement shall be subject to modification in any particular by agreement among the parties, without thereby modifying or abrogating the balance of the agreement, and in the event of the failure of this agreement to dispose of any of the incidental matters affecting the delivery of possession to the City Company, with necessary facilities, equipment, power, etc., for operation, and the inability of the parties hereto to agree respecting the same, the same shall be determined by the court."

The order of October 16, 1919, provided as follows:

VII. This court reserves the right and retains power and jurisdiction to determine any and all rights, claims, liens, or demands which the Brooklyn City Railroad Company, the Brooklyn Heights Railroad Company, and its receiver, their respective successors or assigns, or any trustee, or any other person or corporation, may have one against the other, or against any of said property, or of any lien in respect thereof. Any party in interest, however, may apply to the court for further directions, including application for leave to bring such suit or proceedings as the party may be advised in any other court of competent jurisdiction."

See, also, paragraph X.

The comprehensive nature and purpose of the order are manifested by the reference to "any trustee, or any other person or corporation." In view of the order and agreement supra, and the proceedings under application No. 47, it is unnecessary to discuss the effect of the appearance of Brooklyn City in application No. 48. Although see Camp v. Boyd, 229 U. S. 530, 551, 552, 33 Sup. Ct. 785, 57 L. Ed. 1317; McGowan v. Parish, 237 U. S. 285, 297, 35 Sup. Ct. 543, 59 L. Ed. 955; Henry L. Doherty & Co. v. Toledo Railways & Light Co. (D. C.) 254 Fed. 597; Hume v. City of New York, 255 Fed. 488, 166 C. C. A. 564; Peirce v. New York Dock Co. (C. C. A. 2d Circuit, March 11, 1920) 265 Fed. 148. But, as in application No. 78 there has been special appearance, and as the B. R. T. receiver may claim the construction account, as well as the guaranty fund, the proceeding is too informal and too confused upon which any one should attempt to predicate a decree.

The court, however, considers that it has, and therefore retains, jurisdiction of any controversy arising out of the lease, and it regards the answer of Brooklyn City, application No. 48, as in harmony with the intent of the parties under the agreement of October 16, 1919, and as in harmony with the order of October 15, 1919. So far as concerns the receiver, his duty is, of course, to safeguard the interests of his trust; but that duty does not require him to advance any claim nor interpose any defense which he may deem or be advised is untenable.

Neither the court nor the receiver can have any desire to do other than expedite the determination of the questions involved, to the end that Brooklyn City shall obtain the fund as speedily as possible, if it is entitled thereto. On the other hand, it is the duty of the receiver to ascertain the merits of the claim for the construction account, and to prosecute or assist in prosecuting this claim for the benefit of those entitled thereto. If, as contended by Brooklyn City, the claim is unjust in whole or in part, the facts will in due course appear. If, however, it should appear that the claim is a just one, in whole or in part, and if it may be set off against the guaranty fund, it is the plain duty of

the receiver to take or assist in taking such steps as shall prevent Brooklyn City from obtaining the guaranty fund, and enjoying at the same time, without payment, the benefits which have accrued under paragraph X.

The controversy under paragraph X can, I am sure, be much simplified by conference and agreement. Disputed question can be promptly submitted and promptly disposed of. Therefore the instructions to the receiver under both 48 and 78 are as follows:

"(1) Not to contest the proposition that the damages under paragraph XXXIX are liquidated.

"(2) To ascertain the merits of the claim under paragraph X as speedily as possible, and, if satisfied that the claim is meritorious, in whole or in part, to prosecute or assist in prosecuting said claim.

"(3) To take such steps, or assist in taking the same, as shall prevent the payment over of the guaranty fund until in any event the construction account claim shall have been adjudicated.

"(4) To press such other contentions as he may deem proper.

"(5) To apply for further instructions from time to time, as he may be advised."

In respect of all others interested, it will, of course, be understood that the court does not assume to instruct nor advise them as to the nature of the proceedings to be brought, nor as to the contentions to be advanced. Any one interested may advance such contention as he pleases, whether consistent with this opinion or not, save, however, that any suit or proceedings, for the reasons stated, supra, shall be brought in this court. In respect of the jurisdictional question, the court understands from the papers and proceedings (as distinguished from the argument) that no one has raised any question of jurisdiction in respect of application No. 48, and that no question of jurisdiction has been raised in respect of application No. 78, except by the Brooklyn City.

I am entirely clear as to the protection intended to be afforded to the custodians pending the decision on application No. 48, but as, of course, any stipulation heretofore made will be observed, I shall not volunteer; but I shall be glad to settle the matter, if there is any difference of opinion, as to the purpose and meaning of the proceedings on December 22, 1919, in this regard.

I have not discussed the question of surrender by agreement, as distinguished from termination by breach, nor other questions which might suggest themselves; for whatever questions may be involved should come to issue on pleadings, upon which a final disposition, clearly capable of review, may be had.

Settle order on five days' notice.